1999 UT 1

**STATE of Utah, Plaintiff and Appellee,**

v.

**Donald L. JAEGER, Defendant and Appellant.**

No. 970164.

Supreme Court of Utah.

Jan. 8, 1999.

Jan Graham, Att'y Gen., Christine F. Soltis, Asst. Att'y Gen., and Ernest W. Jones, Salt Lake City, for plaintiff.

Edward K. Brass, L. Clark Donaldson, Salt Lake City, for defendant.

HOWE, Chief Justice:

¶ 1  Defendant Donald L. Jaeger appeals from his second degree murder conviction, a first degree felony in violation of Utah Code Ann. § 76–5–203 (1989).[1]  He contends that (1) the trial court erroneously excluded evidence of the victim's prior suicide attempt; (2) the court erroneously instructed the jury on reasonable doubt;  and (3) the court failed to rule on Jaeger's objections to the presentence report.  We consider each of these assignments of error below.

### FACTS

¶ 2  On August 22, 1990, shortly after midnight, Jaeger called 911 from his home and reported that his nineteen-year-old live-in girlfriend, Mary Barndt, had shot herself. When police and paramedics arrived, they found Mary partially clothed and lying in the kitchen.  A .22 caliber pistol was lying "pretty close" to her right foot,[2] and an empty shell casing was found between her ankles. The police also found a bra next to her body.[3]

¶ 3  Mary was unconscious and had a weak pulse when the paramedics began to treat her injuries.  The bullet entered her neck just above her clavicle and had struck the subclavian artery, causing severe internal

---

1.  Section 76–5–203 was amended in 1991 to delete the language "in the second degree" which followed the term "murder."  Thus the crime for which Jaeger was convicted is now simply known as "murder."

2.  The pistol apparently belonged to one of Jaeger's friends.  Jaeger had borrowed the gun from his friend approximately two weeks before the shooting.

3.  The evidence established that Jaeger did not like Mary's provocative style of dress and that he asked her several times to wear a bra.  However, at trial, Jaeger could not recall how the bra ended up lying next to Mary, or whether he had argued with Mary on the night of her death concerning her failure to wear a bra.

bleeding. In an attempt to preserve evidence, one of the police officers taped brown paper bags on Mary's hands. She died shortly after arriving at the hospital.

¶ 4 Jaeger told one of the officers that when he arrived home from work at about 7:30 p.m., the house appeared empty. However, at 8:30 p.m., he discovered Mary's thirteen-month-old daughter alone in a back bedroom. He admitted that he was angry and upset that Mary had left the child unattended. He called Judy Clark, Mary's mother, in an attempt to locate Mary, but she did not know Mary's whereabouts.

¶ 5 Jaeger also told police that when Mary finally returned home at around 12:10 a.m., he told her that he was tired of her lying and wanted her out of the house by the next day. He said that he then called her mother again and that after a struggle, Mary reluctantly took the phone. He asserted that after Mary began talking to her mother, he threw a blanket and pillow into the hall for her and he then went to bed. He stated that he later awoke to a "bang" and that he found Mary lying unconscious on the kitchen floor. He maintained that she shot herself.

¶ 6 However, other evidence contradicted Jaeger's story. The police swabbed both Jaeger's and Mary's hands for gunshot residue ("GSR"). These swabs were then taken to the state crime lab and examined by two separate experts. Both experts concluded that the swabs taken from Jaeger's hands contained elements of GSR while the swabs taken from Mary's hands did not. Thus the GSR evidence suggested that Jaeger, not Mary, had fired a gun.

¶ 7 In addition to the GSR evidence, Dr. Edward A. Leis, the Deputy Chief Medical Examiner, performed an autopsy on Mary's body. The autopsy showed that Mary died from a gunshot wound to the neck. Moreover, on the basis of the autopsy results, Dr. Leis opined that Mary's death was a homicide, not a suicide.

¶ 8 The State charged Jaeger with second degree murder. However, at the preliminary hearing on that charge, the magistrate dismissed the information for lack of probable cause. The State appealed from the dismissal, and the court of appeals reversed. *See State v. Jaeger,* 896 P.2d 42 (Utah Ct. App.1995).

¶ 9 The central issue at Jaeger's trial was whether Mary's death was a suicide or a homicide. During trial, Jaeger sought to admit certain medical records from Valley Mental Health's Adolescent Residential Treatment & Education Center ("ARTEC"). Mary was a resident of ARTEC from 1986 to 1987 because she was "ungovernable," ran away from home, and abused alcohol and drugs. The ARTEC records contained statements Mary allegedly made admitting that she had attempted suicide in the past but denying any suicidal ideation while a resident of the program. The State objected to the admission of the records; the court sustained the objection, ruling that they were irrelevant.

¶ 10 Jaeger was ultimately convicted as charged and was sentenced to serve a term of five years to life in prison. Thereafter, he moved for a new trial on the basis that the trial court erroneously excluded evidence of Mary's past suicide attempt. The court denied the motion. Jaeger now appeals.

## ANALYSIS

### I. EVIDENCE OF PAST SUICIDE ATTEMPT

¶ 11 The first issue presented is whether the trial court erred in excluding the ARTEC records which contained Mary's statements that she had attempted suicide on a previous occasion. The court excluded these records on the basis that they were irrelevant. Jaeger, however, contends that such records were relevant because the main issue at trial was whether Mary's death was a homicide or a suicide. He further argues that this evidence was admissible under other rules of evidence not considered by the court. We agree that the court erred by excluding this evidence but ultimately conclude that such error was harmless.

### A. *The Relevance of the ARTEC Records*

■ ¶ 12 Rule 401 of the Utah Rules of Evidence defines relevant evidence as "evidence having *any* tendency to make the exis-

tence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401 (emphasis added). In other words, "[e]vidence that has even the slightest probative value" is relevant under the definition in rule 401. Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 4–2 (1996); *see also* Edward L. Kimball & Ronald N. Boyce, *Utah Rules of Evidence*, 1985 Utah L.Rev. 63, 79 (stating that "the general standard for [relevancy] is 'any' probative value").

¶ 13   Irrelevant evidence is inadmissible under rule 402 of the Utah Rules of Evidence. That rule provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or the Constitution of the state of Utah, statute, or by these rules.... *Evidence which is not relevant is not admissible.*" Utah R. Evid. 402 (emphasis added). Thus, where the proffered evidence has no probative value to a fact at issue, it is irrelevant and is inadmissible under rule 402. However, because the standard for determining whether evidence is relevant is so low, the issue of whether evidence is relevant is rarely an issue. *See* Kimball & Boyce, *Utah Evidence Law* 4–6 to 4–7.

¶ 14   The trial court held that ninety-nine percent of the ARTEC records were *irrelevant* and that they were "very speculative, both as to content and as to the time element." Although the trial court did not cite to any particular rule, it apparently concluded that these records failed to meet rule 401's definition of relevant evidence and excluded them under rule 402. This decision was erroneous.

¶ 15   As stated above, the primary issue at trial was whether Mary's death was a homicide or a suicide. Jaeger sought to introduce the ARTEC records as evidence supporting his defense that Mary committed suicide. The court apparently excluded this evidence on the basis that proof that a person attempted suicide when she was a young, "ungovernable" teenager is not probative of whether this same person committed suicide when she was nineteen years old.

¶ 16   We noted earlier that the standard for determining whether evidence is relevant is very low. It is reasonable to believe that a person who has attempted suicide in the past may attempt suicide again. The flaw in the trial court's reasoning was its failure to recognize that while the remoteness of the evidence may reduce its probative value, rule 401 states that relevant evidence is evidence that has "*any* tendency to make the existence of any fact ... more probable or less probable," Utah R. Evid. 401 (emphasis added), and the ARTEC records in this case met that standard.

¶ 17   In sum, we conclude that the trial court erred in holding that the ARTEC records were irrelevant. These records might have aided the jury in determining whether Mary's death was a homicide or a suicide. Thus this evidence was relevant under rule 401 and was not excludable under rule 402.

### B.   The Admissibility of the ARTEC Records under Rule 403

¶ 18   Jaeger next contends that the ARTEC records were "presumptively admissible" under rule 403 of the Utah Rules of Evidence and that "[t]he State can present no evidence or argument to overcome th[at] presumption." Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403 (emphasis added). Under this rule, we presume that the proffered evidence is admissible unless "[it] has an unusual propensity to unfairly prejudice, inflame, or mislead the jury." *State v. Dunn*, 850 P.2d 1201, 1221 (Utah 1993) (citing *State v. Dibello*, 780 P.2d 1221, 1229 (Utah 1989); *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988)). We have noted that we reverse the presumption in favor of admissibility only for "th[ose] categories of evidence [that] are 'uniquely subject to being used to distort the deliberative process and skew a trial's outcome.'" *Dunn*, 850 P.2d at 1222 (quoting *Dibello*, 780 P.2d at 1229) (other citation omitted).

¶ 19  We conclude that the ARTEC records at issue are not the type of evidence that has an unusual propensity to unfairly prejudice, inflame, or mislead the jury. We have held that "gruesome photographs of a homicide victim's corpse [are the type of evidence that] will unfairly prejudice and inflame the jury." *Dunn,* 850 P.2d at 1222. However, for obvious reasons, the ARTEC records at issue in this case do not rise to that level of prejudice. Thus this evidence was presumptively admissible under rule 403.

¶ 20  The State argues that the ARTEC records were nevertheless properly excluded because they were "too time consuming, misleading[, and] prejudicial." It further contends that the trial court implicitly ruled that the ARTEC records were inadmissible under rule 403. We disagree.

¶ 21  In reviewing a trial court's decision to exclude evidence under rule 403, we will not reverse that decision absent an " 'abuse of discretion.' " *Dunn,* 850 P.2d at 1221 (quoting *State v. Hamilton,* 827 P.2d 232, 239–40 (Utah 1992)) (other citations omitted). The trial court did not refer to any of the Utah Rules of Evidence in excluding the ARTEC records. Rather, it merely stated that the ARTEC records were "99 percent irrelevant." As stated above, rule 401 defines "relevant evidence" and evidence which fails to meet that definition is inadmissible under rule 402, not rule 403. Despite the common misconception that rule 403 is a relevancy rule, the exclusion of evidence under that rule is based on policy, not relevancy. *See* Kimball & Boyce, *Utah Evidence Law* 4–6 (1996) ("Most of the appellate opinions that conclude evidence is *not* relevant are in error in that [they] are less reflecting analysis based on logic than decision based

on the kind of policy reflected in rule 403."). Therefore, because the trial court in this case expressly based its decision excluding the ARTEC records from evidence on relevancy grounds, we cannot agree with the State that it implicitly relied on rule 403 in making that decision. Furthermore, even if we agreed with the State, the court's decision would nevertheless be erroneous and an abuse of discretion because rule 403 allows for the exclusion of evidence based on policy analysis, not relevancy. Thus the failure of the court to make the proper analysis under rule 403 would constitute error.

### C.  The Admissibility of the ARTEC Records under the Hearsay Rules

¶ 22  Jaeger next contends that Mary's out-of-court statements concerning a prior suicide attempt were admissible under the hearsay rules.[4] He asserts that such evidence was "not hearsay because it was not sought to be admitted for the truth of the matter asserted, but was sought to be admitted to establish M[ary] Barndt's state of mind as one capable of attempting or committing suicide." However, in making this argument, Jaeger cites to rule 803(3) of the Utah Rules of Evidence.

¶ 23  Jaeger's reliance on rule 803(3) is misplaced for two reasons. First, rule 803(3) is an exception to the hearsay rule; it provides that

[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) *Then existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind,

---

4.  As discussed above, the trial court excluded the ARTEC records on the basis of relevancy and did not discuss the hearsay issue. In fact, the prosecution did not raise this issue as grounds for objection at trial. Ordinarily, the failure to properly preserve an issue for appeal by means of an objection in the trial court, stating the specific grounds for the objection, constitutes a waiver of that issue. *See* Utah R. Evid. 103(a)(1). However, in the past we have considered issues not properly preserved by objection in the trial court where the trial court, in spite of the lack of an objection, considered the issue sua sponte. *See*

*State v. Johnson,* 821 P.2d 1150, 1161 (Utah 1991). In that case we explained, "One of the primary reasons for imposing waiver rules like rule 103(a)(1) is to assure that the trial court has the first opportunity to address a claim that it erred." *Id.* Although the issue of hearsay was not raised by the State during the trial in this case, the parties did raise and argue the issue in connection with Jaeger's motion for a new trial. Thus, since the issue of hearsay was ultimately raised and argued in the court below and that court had the opportunity to consider it, we will consider it on appeal.

emotion, sensation, or physical condition (such as intent, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed. . . .

Utah R. Evid. 803(3) (emphasis in original). As an exception to the hearsay rule, rule 803(3) is applicable only when the statement sought to be offered is hearsay.

¶ 24 Jaeger contends that Mary's statements were admissible under rule 803(3) because they were not sought to be admitted for the truth of the matter asserted. If Jaeger's assertion were true, rule 803(3) would not even be applicable because hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, *offered to prove the truth of the matter asserted.*" Utah R. Evid. 801(c) (emphasis added). In other words, if this evidence was in fact "not sought to be admitted for the truth of the matter asserted," as Jaeger asserts, then it was admissible because it was non-hearsay, not because it fell within the hearsay exception contained in rule 803(3).

¶ 25 Second, Mary's statements concerning her alleged suicide attempt clearly do not fall within rule 803(3). In order to fall within this exception, the proffered evidence must be "[a] statement of the declarant's *then existing state of mind.*" Utah R. Evid. 803(3) (emphasis added). However, it is undisputed that the statements sought to be offered by Jaeger were not statements of Mary's "then existing state of mind." According to the ARTEC records, Mary stated that she had attempted suicide in the *past*, not that she was then attempting or considering suicide. In fact, according to the ARTEC records, Mary did not have any suicidal ideation at the time those records were made. Accordingly, the statements contained in the ARTEC records do not fall within the "state of mind" exception of rule 803(3).

¶ 26 Although Jaeger's reliance on rule 803(3) to support his argument that the ARTEC records were admissible under the hearsay rules is misplaced, we nevertheless hold that his ultimate conclusion is correct—

Mary's statements were admissible under the hearsay rules. We first note, however, that Mary's statements in the ARTEC records were hearsay under rule 801(c). As set forth above, that rule defines hearsay as "*a statement,* other than one made by the declarant while testifying at the trial or hearing, *offered for the truth of the matter asserted.*" Utah R. Evid. 801(c) (emphasis added). In this case, Mary's out-of-court statements to the ARTEC psychologists and counselors concerning her prior suicide attempt were offered for the truth of the matter asserted. Jaeger offered this evidence to show that Mary had attempted suicide in the past and therefore might attempt it again. Thus we hold that such statements were hearsay.

¶ 27 Notwithstanding our conclusion above, we hold that the ARTEC records were admissible under Utah Rule of Evidence 803(4), which provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible as an exception to the hearsay rule. We have held that this rule applies to "statements made to a psychiatrist or a psychologist for the purpose of medical diagnosis or treatment." *State v. Schreuder,* 726 P.2d 1215, 1224 (Utah 1986) (footnote omitted). We have further stated that "[g]enerally, all statements made to psychiatrists or psychologists, regardless of content, are relevant to diagnosis or treatment since experts in the field view everything relating to the patient as relevant to the patient's personality." *Id.* (footnote omitted).

¶ 28 The State nevertheless contends that Mary's statements to the ARTEC psychologists and counselors should be excluded as unreliable since they were made by "an 'ungovernable' fifteen-year-old placed involuntarily in a juvenile facility." Contrary to the State's argument, we think that the foregoing facts enhance rather than diminish the reliability of Mary's admissions. Mary's admission that she had attempted suicide in the past was contrary to her interests as an

involuntary resident of ARTEC. The more problems that she admitted she had, the more likely she was to remain in the program. One would normally expect an "ungovernable" teenager to deny any psychological problems, and to be uncooperative in therapy. Because Mary's statements in the ARTEC records appear reliable, we hold that they clearly fall within the exception provided for in rule 803(4) and were therefore admissible as evidence at trial.

¶ 29 On the basis of the foregoing analysis, we conclude that the trial court erred in excluding the ARTEC records from evidence. We now must decide whether such error was harmful.

### D. Harmless Error

¶ 30 The general rule is that " '[a]n erroneous decision to admit or exclude evidence does not constitute reversible error unless the error is harmful.' " *Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 173 (Utah 1996) (quoting *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995)); *see also* Utah R. Evid. 103(a). Jaeger argues that in making this determination in this case, we must follow the "harmless beyond a reasonable doubt" standard because the trial court's erroneous exclusion of the ARTEC records below constituted a violation of his constitutional rights to present a defense and to confrontation. However, we do not consider this argument because he has failed to properly brief it on appeal.

¶ 31 Rule 24(a)(9) of the Utah Rules of Appellate Procedure provides the general briefing requirements of the parties on appeal. That rule specifically states: "The argument shall contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and record relied on." Utah R.App. P. 24(a)(9). We have made clear that this court is not " 'a depository in which the appealing party may dump the burden of argument and research.' " *State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl*, 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981)). We further clarified

the requirements of rule 24(a)(9) in the recent case of *State v. Thomas*, 961 P.2d 299 (Utah 1998), where we stated that rule 24(a)(9) "[i]mplicitly ... requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *Id.* at 305. In Jaeger's opening brief, he cites to the relevant constitutional provisions and to the cases of *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *Christiansen v. Harris*, 109 Utah 1, 163 P.2d 314, 317 (1945); *State v. Harding*, 635 P.2d 33, 34 (Utah 1981); and *State v. Moton*, 749 P.2d 639, 644 (Utah 1988), as support for his constitutional arguments. However, his brief otherwise lacks any meaningful analysis of this authority. We therefore conclude that Jaeger has failed to adequately brief his constitutional arguments, and in light of this failure, we do not consider them.

¶ 32 We proceed to determine whether the erroneous exclusion of the ARTEC records was harmful. In cases not involving constitutional error, "[w]e have found that an error is *harmful only [when]* the likelihood of a different outcome in the absence of the error is 'sufficiently high so as to undermine [our] confidence in the verdict.' " *Jouflas*, 927 P.2d at 174 (emphasis added) (quoting *State v. Knight*, 734 P.2d 913, 920 (Utah 1987)). A close review of the record convinces us that the erroneous exclusion of the ARTEC records was harmless.

¶ 33 First, contrary to Jaeger's assertion that "[he] had no other means [besides the ARTEC records] of supporting his defense that M[ary] Barndt shot herself," the record shows that he was allowed to introduce a substantial amount of evidence suggesting that Mary might have committed suicide. For instance, the court permitted him to probe into Mary's numerous problems. The jury heard evidence about how Mary was committed to ARTEC when she was fifteen or sixteen years old because she was "ungovernable," "ran away from home," and "used drugs." Jaeger testified that Mary used cocaine, and Caroline Treagle, a neighbor, testified that she found between sixty and eighty beer bottles in Mary's vehicle just after her death. Jaeger was even allowed to

question Mary's mother, Judy Clark, whether she ever attended a group therapy session with Mary in which Mary discussed a former suicide attempt. The evidence further showed that on June 6, 1990, a few months before her death, Mary lost her job for failing to report for work and that on the evening before her death, she left her daughter unattended while she went out drinking. Thus Jaeger was able to establish that Mary faced many problems in her life which might have caused her to commit suicide.

¶ 34 The jury also considered evidence concerning Mary's mental state near the time of her death. Ms. Clark testified that she spoke to Mary on the telephone moments before the shooting. She stated that when Mary took the phone, she was crying and said, "Don [Jaeger] hates me." The jury further considered evidence that Mary told Ms. Clark that "her life was no good" and that she would probably have to give custody of her daughter to the natural father. In sum, the ARTEC records were not the only evidence that Jaeger had to support his defense that Mary committed suicide.

¶ 35 Second, the evidence against Jaeger was overwhelming. As stated above, the police swabbed both Jaeger's and Mary's hands for gunshot residue shortly after the shooting. These GSR swabs were then taken to the state crime lab, where they were examined by two separate experts. One expert, Kevin Smith, examined the swabs that were taken from the webbing and inside of Jaeger's hands and found ten particles on each hand that contained two of the three elements of GSR which is "characteristic of gunshot residue." Another expert, Professor James Gaskill, examined swabs from a different portion of Jaeger's hands and found particles containing all three elements of GSR from which he concluded that there was "a strong likelihood that this individual [Jaeger] fired [the] gun."[5]

¶ 36 Mr. Smith and Mr. Gaskill also examined the swabs taken from Mary's hands. Both experts concluded that Mary's hands were "negative for gunshot residue." In addition, Dr. Leis, the medical examiner, also performed routine GSR tests on Mary's hands before conducting the autopsy and concluded that they were negative for gunshot residue. At trial, Professor Gaskill opined that in light of his tests on the gun that killed Mary, "[he] would expect to find gunshot residue on the hands of anyone who fired th[is] gun." The GSR evidence therefore showed that it was Jaeger, not Mary, who fired the gun on the morning of Mary's death.

¶ 37 In addition to the GSR evidence, the evidence from the autopsy also showed that Mary's death was a homicide, not a suicide. In performing that autopsy, Dr. Leis conducted various tests to determine the angle and range from which the gun was fired. He determined that the gun was fired from a distance of between "9 inches and 10 inches" and concluded that the angle of the wound suggested that Mary could not have fired the gun unless she pulled the trigger with her thumb rather than her index finger. On the basis of the autopsy results, Dr. Leis opined that Mary's death was a homicide and that it was "very unlikely" that Mary had committed suicide.

¶ 38 On the basis of the foregoing, we conclude that the trial court's error in excluding the ARTEC records from trial was harmless. The likelihood of a more favorable outcome in the absence of this error is not sufficiently high so as to undermine our confidence in the result.

## II. THE JURY INSTRUCTION ON REASONABLE DOUBT

¶ 39 The next issue presented by this case is whether the court erred in instructing the jury on reasonable doubt. This instruction read:

Instruction No. 6

All presumptions of law, independent of evidence, are in favor of innocence, and a

---

5. Jaeger attempted to explain the presence of GSR on his hands by claiming that he had dry-fired the gun (firing it unloaded) when he returned home from work that night. However, Professor Gaskill testified that during his tests on the gun, he dry-fired it and discovered that dry-firing the gun failed to produce GSR. Jaeger also adduced evidence that he worked as a mechanic in a shop that was dirty and full of chemicals that could get embedded in his hands.

defendant is presumed innocent until he is proved guilty beyond a reasonable doubt. And in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to an acquittal.

I have heretofore told you that the burden is upon the State to prove the defendant guilty beyond a reasonable doubt. Proof beyond a reasonable doubt does not require proof to an absolute certainty. Now[,] by reasonable doubt is meant a doubt that is based on reason and one which is reasonable in view of all the evidence. It must be a reasonable doubt and not a doubt which is merely fanciful or imaginary or based on a wholly speculative possibility. Proof beyond a reasonable doubt is that degree of proof which satisfies the mind, convinces the understanding of those who are bound to act conscientiously upon it and obviates all reasonable doubt. A reasonable doubt is a doubt which reasonable men and women would entertain, and it must arise from the evidence or the lack of the evidence in this case.

Jaeger argues that the foregoing instruction was "fatally circular and fail[ed] to affirmatively define the government's burden of proof in a criminal case." We disagree.

¶ 40 Although Jaeger correctly points out that the court's reasonable doubt instruction was "the same stock instruction which has repeatedly been upheld by the Utah Court of Appeals," this court recently upheld this same instruction. *See State v. Robertson,* 932 P.2d 1219, 1232–33 (Utah 1997); *accord State v. Ontiveros,* 835 P.2d 201, 206 (Utah Ct.App.1992); *State v. Maestas,* 815 P.2d 1319, 1324 (Utah Ct.App.1991); *State v. Pedersen,* 802 P.2d 1328, 1331 (Utah Ct.App. 1990). In *Robertson,* we stated that the reasonable doubt instruction set forth above is "an appropriate statement of Utah law." 932 P.2d at 1232. Therefore, in accordance with our decision in *Robertson,* we uphold the court's reasonable doubt instruction in this case.

### III. OBJECTIONS TO THE PRESENTENCE REPORT

¶ 41 The final issue presented is whether the trial court erred in failing to resolve Jaeger's objections to the presentence report. We first note that he does not challenge his prison sentence. Rather, he contends that Utah Code Ann. § 77–18–1 requires the trial court to resolve objections to the presentence report on the record and that the court's failure to do so in this instance may be prejudicial to him in the future since "the errors ... will follow [him] to his eventual parole hearings." The statute relied on by Jaeger provides that

[a]ny alleged inaccuracies in the presentence investigation report, which have not been resolved by the parties and the [D]epartment [of Corrections] prior to sentencing, shall be brought to the attention of the sentencing judge, and the judge may grant an additional ten working days to resolve the alleged inaccuracies of the report with the department. If after ten working days the inaccuracies cannot be resolved, the court *shall make a determination of relevance and accuracy on the record.*

Utah Code Ann. § 77–18–1(6)(a) (emphasis added).

¶ 42 Jaeger objected to the presentence investigation report prepared in this case on the basis of errors and omissions therein. In particular, he asserted that the report erroneously stated that (1) the victim, Mary Barndt, was "particularly vulnerable"; (2) Mary's injuries were "unusually extensive"; and (3) Jaeger's offense was characterized by "extreme cruelty [and] depravity." Jaeger also contended that the report omitted several mitigating factors such as his good employment record, strong familial relationships, and clean police record since his initial arrest in 1990. Although the prosecution agreed that the presentence investigation report was incorrect in some aspects, the court refused to amend or modify the presentence report. It stated: "[T]he presentence report is the way it is. I'm taking everything into consideration. As far as my amending or changing the presentence report, I will not make a decision either way."

¶ 43 The State now argues that notwithstanding the foregoing statements by the court, the court did ultimately comply with section 77–18–1(6)(a). It contends that "[t]he plain language of the statute only requires the court to state on the record its view of the relevance and accuracy of the objected-to

information" and that the court did so just before it sentenced Jaeger. For instance, the State points out that "the court viewed defendant's employment [record], remarriage[,] and arrest-free status as commendable but not 'overwhelming.'" The court postulated the following: "Do we allow a person to take a life and then, because of the fact that he takes up a good life, not punish him? Is that justice? No, I don't think it is." From this, the State asserts that the court complied with the requirements of section 77–18–1(6)(a). We disagree.

¶ 44 Although the State is correct that section 77–18–1(6)(a) does not require the judge to "rewrite" the presentence investigation report, it does require the judge to "make a determination of [the] relevance and accuracy [of the report] on the record." Utah Code Ann. § 77–18–1(6)(a). The court did not do this in the instant case. In our view, section 77–18–1(6)(a) requires the sentencing judge to consider the party's objections to the report, make findings on the record as to whether the information objected to is accurate, and determine on the record whether that information is relevant to the issue of sentencing. Statements concerning the court's view of the defendant and the case in general prior to sentencing, as was done in this case, simply do not fully meet the requirements of section 77–18–1(6)(a).

¶ 45 In sum, we conclude that the trial court erred by failing to properly resolve Jaeger's objections to the presentence investigation report. However, because Jaeger does not contend that such error affected his sentence, this error does not require reversal. Rather, the proper remedy is to remand this case to the trial court with instructions that it expressly resolve Jaeger's objections in full compliance with section 77–18–1(6)(a).[6]

## CONCLUSION

¶ 46 We affirm Jaeger's conviction and sentence. Although the court erred in ex-

cluding the ARTEC records as irrelevant, we conclude that such error was harmless. We further hold that the court's instruction on the issue of reasonable doubt was appropriate under our existing case law. Finally, we hold that the court erred in failing to resolve Jaeger's objections to the presentence investigation report and remand for the sole purpose of resolving such objections on the record. The sentence imposed by the trial court is not to be disturbed on remand.

Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE'S opinion.

Justice STEWART dissents.

6. The State argues that Jaeger's concern that the presentence investigation report may prejudice him in seeking parole in the future is misplaced because he can simply provide the Utah Board of Pardons with a copy of the sentencing hearing transcript which implicitly contains the court's rulings on Jaeger's objections to the report. However, as stated above, section 77–18–1(6)(a) requires that the court make an express determination of the parties' objections to the presentence investigation report on the record. Furthermore, we are not convinced that the court's rulings on Jaeger's objections may be implicitly found in the hearing transcript. Therefore, we conclude that remand is necessary so that the trial court may comply with the statute.