2003 UT App 170

STATE of Utah, Plaintiff and Appellee,

v.

**Sean R. SLOAN, Defendant and Appellant.**

**No. 20020333–CA.**

Court of Appeals of Utah.

May 30, 2003.

---

Gregory G. Skordas and Jack M. Morgan, Skordas & Caston LLC, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, and Karen A. Klucznik, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges JACKSON, GREENWOOD, and ORME.

## OPINION

JACKSON, Presiding Judge:

¶ 1 Sean Sloan appeals from a conviction of sodomy on a child, in violation of Utah Code Ann. § 76-5-403.1 (1999), and a conviction of aggravated sexual abuse of a child, in violation of Utah Code Ann. § 76-5-404.1(3) (1999). We affirm.

## BACKGROUND

¶ 2 In March of 2000, Sloan began conversing with Tracie McEwan over an Internet singles chatline. In the first weekend of April 2000, McEwan and her daughters, S.M. and R.M., ages nine and four, went to Idaho Falls to meet Sloan and his two sons, Z.S. and B.S., ages five and three. On May 19, 2000, McEwan and Sloan were married. After the marriage, Sloan and his two sons moved in with McEwan and her children.

¶ 3 During the time they were married, Sloan was employed for only two and a half days and remained home most of the time. McEwan worked as a teacher in the Ogden City School District. She paid her daughter, S.M., and a friend of S.M. eighty dollars a week to help care for the children while she was at work. Sloan would often be the only adult at home during the day with the children.

¶ 4 On June 30, 2000, S.M. told McEwan that Sloan had been grabbing her and her friend, dipping them back, whispering things to them in French, and then kissing them. When McEwan confronted Sloan about S.M.'s accusations, Sloan said, "It's not like I'm sexually harassing them." Shortly thereafter, on July 6, 2000, Sloan and McEwan separated, and Sloan and his sons moved back to Idaho.

¶ 5 After the separation, McEwan noticed a difference in R.M.'s behavior. R.M. became whiney and clingy, began sleeping with McEwan, and urinated on the floor. On August 25, 2000, McEwan took R.M. to see Sandy Watson, a therapist who both S.M. and R.M. had seen after McEwan's previous husband's death. Watson engaged R.M. in some non-directive play therapy and recommended she be interviewed at the Children's Justice Center. On September 12, 2000, R.M. was interviewed at the Children's Justice Center. The interview was videotaped and played for the jury at trial.

¶ 6 About six weeks after Sloan left, R.M. began making accusations to both her mother and Watson about things Sloan had done to her. At various times, R.M. talked about how Sloan had kissed her private parts and had her kiss his. On other occasions, R.M.

talked about how Sloan would show her where a bumble bee bit his private parts. R.M. talked about how the bite hurt Sloan because he made funny breathing sounds until it popped and yellow blood came out. Once, R.M.'s disclosure came after her mother found her kissing the crotch of a doll. Another time, her disclosure came after R.M. stuck a small flag down her underwear and began rubbing her front and back with it.

¶ 7 Like R.M.'s mother, Watson noticed that R.M. often acted out various types of sexual play, such as thrusting her hips, kissing passionately, making sounds, and putting Barbie dolls on top of one another. Watson explained that R.M. exhibited sexualized behavior and a knowledge beyond her age, indicators of sexual abuse. Watson also concluded that requiring R.M. to testify in court would cause her to suffer severe emotional and mental strain.

¶ 8 Toni Hughes, a private mental health therapist who did an assessment of R.M. on September 12, 2001, concluded that R.M.'s behavior was consistent with a child who was experiencing severe emotional and behavioral problems consistent with sexual abuse. Hughes further determined that R.M. would be incapable of giving reliable testimony if required to testify in person at trial, and that doing so would subject R.M. to severe emotional and mental strain.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Sloan challenges the trial court's admission of a videotaped interview of R.M. and its admission of witness testimony that bolstered the credibility of R.M.'s testimony. We review the trial court's decision to admit evidence for abuse of discretion. *See State v. Pena*, 869 P.2d 932, 938 (Utah 1994).

## ANALYSIS

### I. Admission of Video Testimony

¶ 10 Sloan challenges the trial court's admission of R.M.'s videotaped testimony on the grounds that the videotaped testimony was unreliable, prejudicial, and violated his constitutional right to confront the witnesses against him.

¶ 11 The general rule in criminal cases is that "a contemporaneous objection or some form of *specific* preservation of claims of error must be made a part of the trial court record before an appellate court will review such claim on appeal." *State v. Johnson*, 774 P.2d 1141, 1144 (Utah 1989) (quoting *State v. Tillman*, 750 P.2d 546, 551 (Utah 1987)). "[T]he preservation rule applies to every claim, including constitutional questions, unless a defendant can demonstrate that 'exceptional circumstances' exist or 'plain error' occurred." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346.

¶ 12 Sloan claims he preserved his arguments below by filing an objection to the State's Motion for Admission of Child Victim's Statement and Admission of Out-of-Court Statements to Third Parties. Sloan's objection, however, argued inadmissible hearsay and prejudice. It made no reference to reliability or constitutional rights. Moreover, Sloan did not otherwise preserve these issues in the record, and he does not argue exceptional circumstances or plain error on appeal. Accordingly, we decline to consider whether the videotaped testimony was reliable or whether admission of the testimony violated Sloan's constitutional rights. *See Johnson*, 774 P.2d at 1144.

¶ 13 Sloan's remaining contention concerns the prejudicial value of the videotaped testimony. Sloan sets forth a three-paragraph argument against the admissibility of the videotaped testimony based on prejudice. The first two paragraphs are misplaced because they deal with Sloan's constitutional concern that he was not permitted to confront R.M. at trial. The last paragraph contains no legal analysis or authority and simply concludes that the videotape was prejudicial because "[t]he outcome at trial would have likely been different absent the admission of R.M.'s interview."

Briefs that are not in compliance with Rule 24 [of the Utah Rules of Appellate Procedure] may be disregarded or stricken sua sponte by the court. Briefs must contain reasoned analysis based upon relevant legal authority. An issue is inadequately briefed when the overall analysis of the

issue is so lacking as to shift the burden of research and argument to the reviewing court.

*Smith v. Smith,* 1999 UT App 370, ¶ 8, 995 P.2d 14 (quotations and citations omitted); *see also* Utah R.App. P. 24. Sloan's argument regarding the prejudicial value of the videotaped testimony contains no legal analysis and cites no legal authority. Accordingly, we conclude this issue is inadequately briefed and decline to address it.

## II. Admissibility of Witness Testimony

¶ 14 Sloan next challenges the trial court's admission of testimony by Tracie McEwan, Sandy Watson, and Toni Hughes regarding statements made to them by R.M.

### A. McEwan's Testimony

¶ 15 Sloan asserts the trial court improperly permitted McEwan to repeat out-of-court statements made by R.M. regarding Sloan's alleged sexual abuse. Sloan argues this issue in five sentences of legal conclusions with no legal analysis.[1] Therefore, we decline to address this issue because it is inadequately briefed. *See Smith,* 1999 UT App 370 at ¶ 8, 995 P.2d 14.

### B. Watson's Testimony

¶ 16 Sloan also asserts the trial court improperly permitted Watson to repeat out-of-court statements made by R.M. regarding Sloan's alleged sexual abuse. Specifically, Sloan claims R.M.'s statements to Watson were unreliable because (1) Watson received information from both R.M. and her mother, making the exact source of the statements indeterminable; (2) R.M.'s statements were made nearly seven months after the abuse; (3) the statement occurred while R.M. was making similar disclosures to her mother and being interviewed at the Children's Justice Center; and (4) the statements presented to the jury were from notes following Watson's sessions with R.M. rather than memory. None of these contentions have merit.

¶ 17 In *State v. Pecht,* 2002 UT 41, ¶ 23, 48 P.3d 931, our supreme court upheld the admission of statements made over a year after the alleged abuse occurred. The court noted that the trial court's findings concerning the dates of abuse and the dates of the statements "demonstrates the trial court's awareness of the length of time between the abuse and the statements." *Id.* It also noted that "there is no indication that the passage of time had any material effect on the reliability of the statements." *Id.* The same analysis applies here. The trial court found that the alleged sexual abuse between R.M. and Sloan occurred between May 19, 2000, and July 6, 2000, and that R.M.'s statements to Watson were made over a period of time from September 9, 2000 to January 2001. The trial court also found that R.M. was not under any pressure to disclose abuse and that her statements to Watson were not elicited by questioning. Thus, the trial court was aware of the length of time between the alleged abuse and the statements, but it did not find the passage of time to have any bearing on the reliability of R.M.'s statements to Watson.

¶ 18 *Pecht* also rejected the defendant's claim that the court "failed to adequately consider 'the number of times the statement was repeated [to other people] or rehearsed.' " *Id.* at ¶ 24. The court held that "the absence of the [trial] court's express consideration of this element is not error since there is no suggestion that the victim's testimony was memorized or rehearsed" and "the trial court specifically found that none of the statements were prompted, made under improper duress, or affected by any motive to fabricate." *Id.* Here, the trial court specifically found that R.M.'s statements were spontaneous, that they were not elicited by questioning, but volunteered by the child, and that R.M. was not under any pressure to make them. In light of these findings, Sloan's claim that the statements are unreliable because R.M. was simultaneously making statements to other people fails.

---

1. Sloan's argument regarding the out-of-court statements made by McEwan to R.M. relies solely on the following legal conclusions: "The statements were hearsay, ... [they] went to the truth of the allegations made by R.M., ... [they] bolster[ed] the credibility of R.M.'s unreliable statements[, and they were] unduly prejudicial." Sloan then cites two cases for the proposition that a conviction must be based on substantial reliable evidence, but he provides no legal analysis linking his conclusions and the cited authority. An argument that does not contain "reasoned analysis based upon relevant legal authority" is inadequately briefed, and we will not consider the issue. *Smith v. Smith,* 1999 UT App 370, ¶ 8, 995 P.2d 14.

¶ 19 Sloan's claim that R.M.'s statements to Watson were unreliable because they were from the notes following Watson's sessions with R.M., and were therefore not presented verbatim to the jury, suffers the same fate. First, Watson's progress notes are replete with statements recording what R.M. said, many with quotation marks around them. Sloan has presented no evidence showing that these statements were not recorded verbatim or close to it. Second, no Utah case law requires that statements be reproduced verbatim. Rather, " ' "whether the statement is reproduced verbatim in court" ' " is merely one factor in determining its reliability. *State v. Quinonez–Gaiton,* 2002 UT App 273, ¶ 23, 54 P.3d 139 (quoting *State v. Matsamas,* 808 P.2d 1048, 1051 (Utah 1991) (quoting *State v. Nelson,* 725 P.2d 1353, 1356 n. 3 (Utah 1986))). Because the focus is on reliability, the concern is not whether the statements are produced verbatim in court, but whether they are reproduced in a manner that ensures their accuracy. The trial court's finding that R.M.'s statements to Watson were recorded in her treatment notes, during or shortly after each session, indicates that the trial court considered that question.

¶ 20 Finally, Sloan attacks some of Watson's statements as having come from R.M.'s mother instead of R.M. directly. Sloan affirmatively waived this claim below. The trial court's ruling in this case allowed for the admission of statements made by R.M. during her therapy sessions with Watson. If Watson testified to statements made outside those sessions, i.e., statements Watson learned through R.M.'s mother, Sloan had an obligation to object to the admission of the statements at the time they were offered. *See State v. Hardy,* 2002 UT App 244, ¶ 15, 54 P.3d 645 (holding that requirement for specific, timely objection "arises out of the trial court's need to assess allegations by isolating relevant facts and considering them in the context of the specific legal doctrine placed at issue." (citation omitted)). However, Sloan made no objection to the evidence when admitted, instead hoping to undermine its weight on cross-examination. Although Sloan was unsuccessful in this attempt, his willingness to forego objecting in the hopes of undermining the witness's testimony on cross-examination is a strategic choice that forecloses review of the matter on appeal. *See State v. Bullock,* 791 P.2d 155, 159 (Utah 1989) ("If the decision [to not object] was conscious and did not amount to ineffective assistance of counsel, this Court should refuse to consider the merits of the trial court's ruling."). Consequently, Sloan's claim fails.

## C. Hughes's Testimony

¶ 21 Lastly, Sloan claims the court erred under *State v. Rimmasch,* 775 P.2d 388 (Utah 1989), in allowing Toni Hughes to provide an opinion that R.M. was truthful when making statements to her about sexual abuse.[2] Sloan's claim fails on the merits.

¶ 22 In *Rimmasch,* the supreme court made three holdings that Sloan now invokes. First, "an expert may not testify that . . . the story of an alleged victim in a child abuse case was true." *State v. Kallin,* 877 P.2d 138, 140 (Utah 1994) (citing *Rimmasch,* 775 P.2d at 392); *see also Rimmasch,* 775 P.2d at 391–92 (holding rule 608(a) of the Utah Rules of Evidence "bars admission of an expert's testimony as to the truthfulness of a witness on a particular occasion"); Utah R. Evid.

---

2. Sloan also claims the trial court improperly allowed Hughes to testify about out-of-court statements made to her by R.M. Hughes's testimony was admissible as substantive evidence under rule 803(4) of the Utah Rules of Evidence. Under rule 803(4), "[s]tatements made for purposes of medical diagnosis or treatment" are "not excluded by the hearsay rule," whether or not the declarant testifies. Utah R. Evid. 803(4). This rule has been applied to psychiatrists and psychologists, *see State v. Jaeger,* 1999 UT 1, ¶ 27, 973 P.2d 404; *State v. Schreuder,* 726 P.2d 1215, 1224 (Utah 1986), as well as social workers and therapists. *See United States v. Balfany,* 965 F.2d 575, 581 (8th Cir.1992); *State v. Stancil,* 146 N.C.App. 234, 552 S.E.2d 212, 217 (2001). Hughes, a licensed clinical social worker, was engaged by the prosecutor to diagnose R.M.'s mental and emotional condition as it related to her ability to testify at trial. During her evaluation, Hughes concluded that the symptoms exhibited by R.M. were consistent with those exhibited by a child who had been sexually abused. Both before and at trial, Hughes testified that her interview with R.M. was relevant to these diagnoses. Accordingly, we cannot say the trial court erred in allowing Hughes to testify regarding out-of-court statements made to her by R.M.

608(a). Second, an expert cannot testify "that an alleged child abuse victim had been abused if the opinion was based, even in part, on the conformance of a victim's behavior to a child sexual abuse profile if there was no scientific evidence establishing the scientific accuracy of the profile in identifying sex abuse victims." *Kallin*, 877 P.2d at 140 (citing *Rimmasch*, 775 P.2d at 390, 393). Finally, "an expert [can]not base testimony that a child had been sexually abused on the expert's acceptance of the victim's story as a truthful account." *Kallin*, 877 P.2d at 140–141.

¶ 23 Sloan's brief is unclear regarding how the trial court allegedly violated *Rimmasch*. It seems to imply, however, that the trial court improperly allowed Hughes to testify definitively that R.M. had been abused, and that Hughes violated *Rimmasch* by testifying that R.M. was telling the truth when she made her allegations.

¶ 24 To the extent these are Sloan's claims, the record does not support them. Hughes never testified that R.M. had been sexually abused. Moreover, she did not testify that R.M. was telling the truth when she claimed she was abused or that Hughes's conclusions regarding R.M.'s behavior were based on her belief that R.M. was telling the truth.

¶ 25 Rather, Hughes testified only that, based on the behavioral information she had gathered from interviewing R.M. and from people who had observed R.M.'s behavior before and after the alleged abuse, R.M.'s behavior was consistent with sexual abuse. The supreme court has held that this evidence is admissible under *Rimmasch*. *See State v. Loose*, 2000 UT 11, ¶ 11, 994 P.2d 1237 (holding "properly founded expert testimony that is limited to the statement that a particular child's behavior is 'consistent with' symptoms that might be exhibited by one who was sexually abused" is admissible); *Kallin*, 877 P.2d at 141 (holding that, where expert "[does] not ... testify to any kind of sexual abuse profile as such," her testimony "that the victim's symptoms were 'consistent with' sexual abuse" is admissible).

## CONCLUSION

¶ 26 We decline to address whether the trial court properly admitted R.M.'s video-taped testimony because Sloan did not properly preserve two of his three arguments on the issue and inadequately briefed the third. Similarly, we decline to address whether the trial court properly admitted out-of-court statements made by R.M. to McEwan because Sloan did not adequately brief the issue. We cannot say the trial court improperly admitted Watson's testimony because neither the fact that R.M.'s statements were made nearly seven months after the abuse nor the fact that R.M. was simultaneously making similar statements to other people undermines the reliability of the statements, and Utah law does not require that the child's statements be reproduced verbatim. Finally, we cannot say the trial court improperly admitted the testimony of Hughes because testimony that a particular child's behavior is consistent with child abuse is admissible.

¶ 27 I CONCUR: PAMELA T. GREENWOOD, Judge.

¶ 28 I CONCUR IN THE RESULT: GREGORY K. ORME, Judge.