2015 UT App 28

# THE UTAH COURT OF APPEALS

MARTYN E. KINGSTON AND LOUISE D.S. KINGSTON,
Plaintiffs and Appellants,

*v.*

STATE FARM AUTOMOBILE INSURANCE COMPANY AND STATE FARM
FIRE AND CASUALTY COMPANY,
Defendants and Appellees.

Opinion
No. 20131045-CA
Filed February 5, 2015

Third District Court, Silver Summit Department
The Honorable Todd M. Shaughnessy
No. 110500838

Bret M. Hanna and Thomas E. Shaw, Attorneys
for Appellants

Paul M. Belnap, Jennifer R. Carrizal, and Nicholas
E. Dudoich, Attorneys for Appellees

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN
concurred.

VOROS, Judge:

¶1      This case arises from an insurance claim made after an automobile collision involving an underinsured driver. Because of the risk posed by underinsured motorists, state law contains a default coverage provision. This provision mandates that all automobile insurance policies provide underinsured motorist (UIM) coverage limits equal to (1) the maximum UIM limits available under that policy or (2) that policy's liability limits, whichever is less, unless the insured purchases coverage in a lesser amount or rejects UIM coverage altogether by signing an acknowledgment form containing specified disclosures. Here,

the district court ruled on summary judgment that the insureds were not entitled to default maximum UIM coverage, because the insurer had adequately informed them about UIM coverage and the insureds had knowingly opted for lower coverage limits. We affirm that ruling.

BACKGROUND

¶2     This case involves two insurance policies: an Automobile Insurance Policy and a $1,000,000 Personal Liability Umbrella Policy. Plaintiffs Martyn E. Kingston and Louise D.S. Kingston are the insureds under both policies. State Farm Automobile Insurance Company issued the Automobile Policy; State Farm Fire and Casualty Company issued the Umbrella Policy (collectively, State Farm). After the accident giving rise to this case, State Farm paid the Kingstons an amount equal to the UIM coverage limits stated in the Automobile Policy. However, the Kingstons contend that because State Farm failed to comply with statutory requirements, they are entitled to an additional $150,000 under the Automobile Policy and an additional $1,000,000 under the Umbrella Policy.

¶3     In 2004, the Kingstons purchased the Umbrella Policy. The Umbrella Policy application stated, "If the applicant does not want Uninsured/Underinsured Motor Vehicle Coverage, or does not have Uninsured/Underinsured Motor Vehicle Coverage limits of 250/500, the Rejection below must be signed." On the Umbrella Policy application, applicants could check a box rejecting UIM coverage "on all vehicles" or a box rejecting coverage "on recreational vehicles only." State Farm's representative checked both boxes. Mr. Kingston reviewed the information contained in the Umbrella Policy application and signed it. Ms. Kingston did not sign the Umbrella Policy application.

¶4 In 2006, the Kingstons insured their new Subaru Outback with State Farm. State Farm offered the Kingstons the option to purchase UIM coverage to complement their ordinary collision coverage.[1] As part of the process of purchasing UIM coverage, State Farm presented the Kingstons with a "Selection/Rejection of Underinsured Motorist Coverage Form" as required under section 31A-22-305.3 of the Utah Insurance Code (the UIM statute). *See* Utah Code Ann. § 31A-22-305.3(2)(b) (LexisNexis Supp. 2008). The Selection/Rejection Form notified the Kingstons of the scope of their UIM coverage:

> This coverage selection or rejection shall be applicable to the policy of insurance on the vehicle described below [the Subaru], on all future renewals of the policy, and on all replacement policies unless and until I make an express written request to add or increase the coverage(s). I sign this acknowledgment on behalf of all applicants and insureds under the policy.

The Kingstons each signed and dated the Selection/Rejection Form after selecting UIM coverage limits of $100,000 per person and $300,000 per occurrence (100/300). The 100/300 limits were for an amount less than the policy's maximum liability limits of $250,000 per person and $500,000 per occurrence (250/500). State Farm issued policy number 050-0493 for the Subaru.

¶5 In 2008, the Kingstons purchased another vehicle, a Chevrolet Suburban, and garaged the Subaru. State Farm

---

1. The UIM issues we discuss could also arise with respect to uninsured motorist (UM) coverage. *See* Utah Code Ann. § 31A-22-305 (LexisNexis 2014). But here the driver at fault was under-, rather than un-, insured. Accordingly, we address only the UIM statute and associated caselaw.

substituted the Chevrolet for the Subaru on the Automobile Policy but made no other changes to the policy. State Farm did not obtain from the Kingstons a fresh Selection/Rejection Form naming the Chevrolet. And State Farm did not send the Kingstons a notice "reasonably explain[ing] the purpose of [UIM] coverage." *See id.* § 31A-22-305.3(2)(b)(iv). Under the 2012 version of the UIM statute, this "Important Notice Regarding Uninsured and Underinsured Motor Vehicle Coverage" (Important Notice) should have been sent within thirty days of the date the Kingstons substituted the Chevrolet for the Subaru. *See id.* § 31A-22-305.3(3)(c)(iii) (LexisNexis Supp. 2012).[2]

¶6　　Two months later, State Farm sent the Kingstons a notice stating that it had automatically renewed the Automobile Policy (the Automatic Renewal). The Automatic Renewal notice stated the 100/300 UIM policy limits and listed the Chevrolet as the covered vehicle. The Automatic Renewal also directed the Kingstons to contact State Farm if they wanted to increase their UIM coverage to 250/500.

¶7　　Months later, while driving the insured Chevrolet, Ms. Kingston suffered injuries in a collision with an underinsured driver. The Kingstons filed a claim, and State Farm paid $100,000, an amount equal to the limit of the Kingstons' UIM liability coverage under the Automobile Policy. More than two years after accepting the $100,000 payment, the Kingstons sent a letter to State Farm seeking an additional $150,000 under the Automobile Policy and $1,000,000 under the Umbrella Policy. State Farm declined to pay the additional benefits, and the Kingstons sued.

---

2. As explained below, the Kingstons contend that the 2012 version of the statute applies to this dispute. *See supra* ¶¶ 19–23.

¶8 The Kingstons alleged that State Farm failed to adequately inform them of UIM coverage for the Chevrolet in two respects. First, they asserted State Farm failed to obtain a fresh Selection/Rejection Form when adding the Chevrolet to the Automobile Policy. *See id.* § 31A-22-305.3(2)(b) (LexisNexis Supp. 2008). Second, they asserted that State Farm failed to send the Kingstons an Important Notice about UIM coverage within thirty days of the Kingstons' acquiring the Chevrolet. *See id.* § 31A-22-305.3(3)(c)(iii) (LexisNexis Supp. 2012).

¶9 The Kingstons also alleged that State Farm owed them the maximum $1,000,000 of coverage under the Umbrella Policy. The 2004 Umbrella Policy application required the Kingstons to sign a rejection provision if they opted to reject maximum UIM coverage. Mr. Kingston signed the rejection provision. The Kingstons asserted that they were nevertheless entitled to the $1,000,000 maximum coverage for three reasons. First, they asserted that the Umbrella Policy application violated the UIM statute because the application did not "reasonably explain[] the purpose of underinsured motorist coverage." *See* Utah Code Ann. § 31A-22-305.3(2)(b)(iv) (LexisNexis Supp. 2008). Second, they asserted that Mr. Kingston's rejection did not bind Ms. Kingston, the injured driver. And third, they asserted that the rejection provision of the Umbrella Policy application was ambiguous.

¶10 After discovery, the Kingstons moved for partial summary judgment. State Farm responded with a cross-motion for partial summary judgment. The district court denied the Kingstons' motion and granted State Farm's motion. The district court ruled that State Farm was "not obligated to provide coverage in excess of the $100,000 limit" stated in the Automobile Policy and that the Kingstons were "not entitled to umbrella coverage." The Kingstons timely appealed.

ISSUES

¶11    First, the Kingstons contend that the district court erred in denying them $250,000 in UIM coverage under the Automobile Policy pursuant to the default provision of the UIM statute. *See id.* § 31A-22-305.3(2)(b); *id.* § 31A-22-305.3(3)(c)(iii) (LexisNexis Supp. 2012).

¶12    Second, the Kingstons contend that the district court erred in denying them the maximum $1,000,000 coverage under the Umbrella Policy. *See id.* § 31A-22-305.3(2)(b)(iv) (Supp. 2008).

¶13    Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We review a district court's "legal conclusions and ultimate grant or denial of summary judgment for correctness, and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted).

ANALYSIS

I. The Automobile Insurance Policy

¶14    The UIM statute requires that "[f]or new policies written on or after January 1, 2001," insurers must provide uninsured motorist coverage limits equal to the maximum UIM limits available under that policy or that policy's liability coverage limits, whichever is less, unless the insured waives maximum

UIM coverage. *See* Utah Code Ann. § 31A-22-305.3(2)(b) (LexisNexis Supp. 2008).[3]

¶15    Utah passed the uninsured and underinsured motorist statutes "in response to an urgent concern that citizens of the state did not understand the consequences of not carrying uninsured or underinsured motorist coverage." *Iverson v. State Farm Mut. Ins. Co.*, 2011 UT 34, ¶ 16, 256 P.3d 222. The UM/UIM statutes require that insurers notify policyholders about the UM/UIM coverage options available to them. *Id.* ¶ 17; *see also General Sec. Indem. Co. of Ariz. v. Tipton*, 2007 UT App 109, ¶¶ 11–15 & n.6, 158 P.3d 1121 (detailing the legislative history and public policy considerations motivating Utah's UM/UIM statutes). The UM/UIM statutes do not require insureds to purchase UM/UIM coverage; instead, they permit insureds to select a lower amount of UM/UIM coverage than the amount of liability coverage they have, or none at all. But the statutes require insurers to "affirmatively inform[] insureds about the costs of various levels of UM[/UIM] coverage before they decide whether to purchase it and in what amounts." *Tipton*, 2007 UT App 109, ¶ 12 (first alteration in original) (citation and internal quotation marks omitted).

¶16    If an insurer issues a "new" automobile insurance policy without obtaining a waiver of UIM coverage from the insured,

---

3. This section was amended in 2014. Utah Code Ann. § 31A-22-305.3 (LexisNexis 2014). Because this dispute arose before the amendments were passed, they do not affect our analysis. *See State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829 (holding that unless a statutory provision "is expressly declared to be retroactive" or its "purpose . . . is to clarify the meaning of an earlier enactment . . . . the retroactivity ban holds, and courts must apply the law in effect at the time of the occurrence regulated by that law" (citations and internal quotation marks omitted)).

the insured receives UIM coverage in the maximum amount that she could have purchased under the type of policy she owns, rather than the amount she in fact purchased. *See id.* ¶¶ 20, 22–23 (concluding that the maximum UM coverage "available by the insurer under the insured's . . . policy" refers to the maximum amount the insured could have purchased rather than the amount actually purchased).

¶17    The Kingstons contend that they are entitled to $250,000, rather than $100,000, in benefits under the Automobile Policy. The Kingstons' Automobile Policy had liability coverage of $250,000 per person or $500,000 per occurrence. Because $250,000 is "the lesser of the limits of the insured's motor vehicle liability coverage or the maximum underinsured motorist coverage limits available by the insurer under the insured's motor vehicle policy," the Kingstons are entitled to this amount of coverage if State Farm failed to obtain a UIM waiver. *See* Utah Code Ann. § 31A-22-305.3(2)(b) (LexisNexis Supp. 2008).

¶18    The Kingstons signed such a waiver when they purchased the Automobile Policy in 2006 but not when they added the Chevrolet to the policy in 2008. The Kingstons assert that by substituting the Chevrolet for the Subaru on the Automobile Policy and issuing the Automatic Renewal State Farm issued a "new policy" without obtaining a fresh Selection/Rejection Form. *See id.* They also assert that State Farm violated the UIM statute by failing to send them an Important Notice explaining the purpose of UIM insurance within thirty days of adding the Chevrolet to the Automobile Policy. The Kingstons argue that these two violations triggered the default provision of the UIM statute, and as a result they are entitled to the policy limit of $250,000. *See id.* § 31A-22-305.3(3)(c)(iii) (LexisNexis Supp. 2012).

A.    The Selection/Rejection Form

¶19    The Kingstons first assert that State Farm violated the UIM statute by failing to obtain a fresh Selection/Rejection Form

when it issued the Automatic Renewal replacing the Subaru with the Chevrolet on the Automobile Policy.

¶20    As explained above, the UIM statute requires that "[f]or new policies written on or after January 1, 2001," insurers provide underinsured motorist coverage "equal to the lesser of the limits of the insured's motor vehicle liability coverage or the maximum underinsured motorist coverage limits available by the insurer under the insured's motor vehicle policy." *Id.* § 31A-22-305.3(2)(b) (LexisNexis Supp. 2008). An insured can decline maximum UIM coverage by signing a Selection/Rejection Form that, among other things, "waives the higher coverage," "reasonably explains the purpose of underinsured motorist coverage," and "discloses the additional premiums required to purchase underinsured motorist coverage." *Id.* § 31A-22-305.3(2)(b)(iii)–(v).

¶21    Accordingly, the Kingstons are entitled to the higher coverage limits mandated by this section only if the Automatic Renewal qualifies as a "new policy." The Kingstons signed a Selection/Rejection Form when they purchased the Automobile Policy in 2006. In 2008, State Farm issued the Kingstons the Automatic Renewal listing the Chevrolet as the insured vehicle. But the Kingstons did not sign a fresh Selection/Rejection Form. Because State Farm issued the Automatic Renewal after January 1, 2001 without obtaining a fresh Selection/Rejection Form, it violated the UIM statute if the Automatic Renewal constituted a "new policy."

¶22    Whether the Automatic Renewal constituted a "new policy" depends upon what definition of "new policy" applies in this case. Prior to 2012, the UIM statute did not define "new policy." We first consider whether the definition of "new policy" added in 2012 to the UIM statute applies to this 2008 dispute. If not, we apply the pre-2012 common-law definition of "new policy." Generally, "we apply the law as it exists at the time of

the event regulated by the law in question." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." Utah Code Ann. § 68-3-3 (LexisNexis 2011).

¶23 The 2012 version of the UIM statute specifies that the statutory definition of "new policy" applies retroactively in certain cases:

> [The definition of "new policy"] applies retroactively to any claim arising on or after January 1, 2001 for which, as of May 1, 2012, an insured has not . . . filed a complaint in a court of competent jurisdiction.

*Id.* § 31A-22-305.3(3)(e)(i) (LexisNexis Supp. 2012). In this case, the accident giving rise to the Kingstons' claim occurred after January 1, 2001, but they filed their complaint on November 4, 2011. Therefore, by its own terms, the statutory definition of "new policy" in the 2012 version of the statute does not apply to this case.

¶24 We accordingly turn to caselaw. The Utah Supreme Court defined "new policy" in *Iverson v. State Farm Mutual Insurance Co.*, 2011 UT 34, 256 P.3d 222. This definition constitutes "the law as it exist[ed] at the time of the event regulated by the law in question," *see Clark*, 2011 UT 23, ¶ 13. Accordingly, *Iverson*'s interpretation of "new policy" governs. In *Iverson*, our supreme court held that "an individual has a 'new policy' under the statute if she enters a new contractual relationship with her insurer, or if there is a material change in her existing policy." 2011 UT 34, ¶ 20. Declining to "categorically say that a particular change is always material or immaterial," the court concluded that the primary focus should be on whether a change to a policy "would meaningfully alter the risk relationship between the insurer and the insured." *Id.* ¶ 22.

¶25 "[T]o determine whether a change to an existing policy is so material that it creates a new policy under the [UIM] statute," *id.*, we consider three relevant, though not determinative, factors: (1) whether "the change to the policy was one requested by the insured or a routine . . . change made by the insurance company"; (2) whether "the average insured would want to reevaluate the amount of risk she would be willing to bear under the policy" in response to the policy change; and (3) whether the "character of the changes would lead the average insured to believe she was receiving a new policy." *Id.*

¶26 Considering the "totality of circumstances," *id.*, noted above, the district court concluded that the substitution of the Chevrolet for the Subaru did not constitute a "material change[] to an existing policy that alter[ed] the risk relationship between the insurer and the insured," *see id.* ¶ 15. We agree.

¶27 The Automatic Renewal consisted of a single form, clearly labeled "Auto Renewal." State Farm had sent an "Auto Renewal" form to the Kingstons on at least four prior occasions during their business relationship. The Automatic Renewal listed the Chevrolet as the insured vehicle under policy number 050-0493, the same policy number State Farm issued for coverage of the Subaru. The Kingstons were not required to complete a new application. The Automatic Renewal did not change the insureds, the premium, or the coverages. In particular, the Kingstons' 100/300 UIM coverage remained the same. In fact, "the Automatic Renewal directed them to contact State Farm if they wished to increase their UIM coverage." They did not do so.

¶28 The substitution of vehicles on the policy "was one requested by the insured." *Id.* ¶ 22. But the Kingstons give no reason why "the average insured would want to reevaluate the amount of risk she would be willing to bear under the policy," *see id.*; nor would the insured have a reason to reevaluate where,

as here, the amount of risk was identical under the original policy and the Automatic Renewal. Nor have the Kingstons shown that "the character of the change[] would lead the average insured to believe she was receiving a new policy." *See id.* On the contrary, the character of the change—pursuant to which insureds, premiums, and coverages all remained the same—as well as the title of the document ("Automatic Renewal"), would lead the average insured to believe that she was receiving a renewal of the original policy, not a new policy. The Chevrolet was merely "a newly acquired or replacement motor vehicle covered under the terms of the [existing] policy." Utah Code Ann. § 31A-22-305.3(2)(a)(ii)(B) (LexisNexis Supp. 2008).

¶29　Because the substitution of the Chevrolet for the Subaru constituted neither a "new contractual relationship with [State Farm]," nor a "material change in [the Kingstons'] existing policy," the Automobile Policy does not qualify as a "new policy" for purposes of the UIM statute. *See Iverson v. State Farm Mut. Ins. Co.*, 2011 UT 34, ¶ 20, 256 P.3d 222. Accordingly, the UIM statute did not require State Farm to obtain a fresh Selection/Rejection Form for the Chevrolet.

¶30　The Kingstons next argue that even if the substitution of the Chevrolet did not create a "new policy" under the statute, State Farm was nonetheless required to obtain a fresh Selection/Rejection Form for the Chevrolet because the original form by its own terms applied only to the Subaru. In support of this argument, the Kingstons rely on this passage in the Selection/Rejection Form:

> This coverage selection or rejection shall be applicable to the policy of insurance *on the vehicle described below* [the Subaru], on *all future renewals of the policy*, and on *all replacement policies* unless and until I make an express written request to add or

increase the coverage(s). I sign this acknowledgment on behalf of all applicants and insureds under the policy.

(Emphasis added.) The Kingstons assert that the phrase "replacement policies" contains an ambiguity because it could be read to refer to replacement policies on the Subaru only (a reading that would favor them) or to replacement policies on vehicles replacing the Subaru (a reading that would favor State Farm). This ambiguity, they contend, must be resolved in their favor.

¶31    But the district court's ruling did not rely on the phrase the Kingstons challenge. The quoted provision refers not only to "replacement policies," but also to "all future renewals of the policy." And as the district court observed, "whether the policy was 'replaced' or not, it was clearly 'renewed,' meaning that the selection/rejection form continued to apply." Because the Automatic Renewal qualified as a "future renewal[] of the policy," the UIM statute did not require State Farm to obtain a fresh Selection/Rejection Form from the Kingstons.

B.    The Important Notice

¶32    The Kingstons next assert that the 2012 version of the UIM statute required State Farm to send an Important Notice to them within thirty days of adding the Chevrolet to the Automobile Policy. The Kingstons argue that "whenever a consumer buys a new car, one of two things must happen: either the insurance company must get a selection/rejection form, or it must send out the [Important Notice] within thirty days of the purchase of that vehicle." They argue that because State Farm did not obtain a new signed Selection/Rejection Form for the Chevrolet, "the Kingstons were entitled to such notice" in a timely manner. State Farm concedes that it did not provide the Important Notice. But it denies any obligation to do so on the ground that the Important Notice requirement set forth in the

2012 version of the UIM statute does not apply retroactively to this 2008 dispute.

¶33    The Important Notice requirement, which first appeared in the 2012 version of the UIM statute, requires insurers to notify policyholders of the purpose of UIM coverage:

> If an additional motor vehicle is added to a personal lines policy where underinsured motorist coverage has been rejected, or where underinsured motorist limits are lower than the named insured's motor vehicle liability limits, the insurer shall provide a notice to a named insured within 30 days that: (A) reasonably explains the purpose of uninsured motorist coverage; and (B) encourages the named insured to contact the insurance company or insurance producer for quotes as to the additional premiums required to purchase uninsured motorist coverage . . . .

Utah Code Ann. § 31A-22-305.3(3)(c)(iii) (LexisNexis Supp. 2012). But the events giving rise to this dispute occurred in 2008. Therefore, State Farm must adhere to the Important Notice requirement only if it applies retroactively.

¶34    "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." *Id.* § 68-3-3 (LexisNexis 2011). The 2012 version of the UIM statute specifies that subsection (3)(b) is retroactive, but is silent as to the provision at issue here, subsection (3)(c). *See id.* § 31A-22-305.3(3)(e)(i) (Supp. 2012).

¶35    Because we must "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful," *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863, we must conclude subsection (3)(c)(iii)'s Important Notice requirement applies only prospectively.

Accordingly, State Farm was not required to provide Important Notice in 2008.

¶36   Furthermore, as the district court noted, retroactively applying the Important Notice provision would produce absurd results:

> [T]he statute would impose a duty on an insurer to do something the insurer had no way of knowing it was required to do. Under the [Kingstons'] theory, State Farm had to send a 30-day notice in July/August of 2008, even though the 30-day notice requirement did not become part of the statute until 2012—years later.

We agree with the district court that the statute does not command the impossible—in this case, time travel—from insurers.

¶37   In conclusion, we affirm the district court's partial summary decision pertaining to the Automobile Policy. The district court did not err in concluding that State Farm was not required to obtain a new Selection/Rejection Form when it substituted the Chevrolet for the Subaru. Nor did the district court err in concluding that State Farm was not required to provide the Kingstons the Important Notice required under the 2012 version of the UIM statute.[4]

---

4. The Kingstons also argue that "even assuming the [Selection/Rejection Form] could apply to the 2008 Chevrolet, State Farm must establish that the Kingstons directed State Farm" to replace the Subaru with the Chevrolet. Because, the Kingstons argue, State Farm cites "no evidence for that assertion," it "cannot meet that burden." However, the Kingstons do not explain why this argument favors them.

(continued…)

## II. The Umbrella Policy

¶38    The Kingstons also contend the district court erred in rejecting their claim for $1,000,000 under the Umbrella Policy. The Kingstons assert three reasons for this result. First, they argue that the Umbrella Policy application failed to "reasonably explain[] the purpose of uninsured motorist coverage." Utah Code Ann. § 31A-22-305.3(2)(b)(iv) (LexisNexis Supp. 2008). Second, the Kingstons argue that Mr. Kingston could not sign the Umbrella Policy rejection on Ms. Kingston's behalf, because "Utah law is clear that a husband is not an agent for his wife as a matter of law." *See, e.g.*, *Fox v. Lavender*, 56 P.2d 1049, 1052 (Utah 1936) (noting that the "mere fact that there was the relationship of husband and wife does not show agency"). Finally, the Kingstons assert that the Umbrella Policy application contains ambiguities that should be construed against State Farm as a matter of law. *See, e.g.*, *Farmers Ins. Exch. v. Versaw*, 2004 UT 73, ¶ 24, 99 P.3d 796 ("[B]ecause insurance policies are adhesion contracts, they are to be construed liberally in favor of the insured . . . so as to promote and not defeat the purposes of insurance." (citation and internal quotation marks omitted)).

¶39    The difficulty with the Kingstons' argument on this point lies in the fact that it challenges only one of two grounds for the district court's ruling. "This court will not reverse a ruling of the trial court that rests on independent alternative grounds where the appellant challenges only one of those grounds." *Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30,

---

(…continued)

Because the argument contains no "reasoned analysis based upon relevant legal authority," it is inadequately briefed. *State v. Sloan*, 2003 UT App 170, ¶ 13, 72 P.3d 138; *see also* Utah R. App. P. 24(a)(9). Furthermore, our review of the record indicates the record does not support it.

¶ 28, 297 P.3d 38; *see also Simmons Media Group, LLC v. Waykar, LLC,* 2014 UT App 145, ¶¶ 32–35, 335 P.3d 885.

¶40     The district court set forth two independent, alternative rationales for granting partial summary judgment to State Farm on the question of the Kingstons' Umbrella Policy. First, the court concluded that under the terms of the Umbrella Policy, the Kingstons were required to carry UIM coverage of $250,000/$500,000 on the underlying Automobile Policy to qualify for UIM umbrella benefits.[5] The court ruled—properly, as we hold above—that the Kingstons' Automobile Policy did not provide $250,000/$500,000 UIM coverage, nor were they entitled to this coverage by operation of law. "Thus," the court concluded, "based on the terms of the Umbrella Policy itself, State Farm has no obligation to pay benefits."

¶41     The Kingstons do not challenge this ground for the district court's ruling. Accordingly, under the authorities cited above, we affirm the ruling of the district court.

¶42     After explaining the principal ground for its ruling, the court continued, "But even if the foregoing was not true, the Kingstons as a matter of law, would still not be entitled to the benefits under the umbrella policy, because the umbrella policy is not a motor vehicle insurance policy and compliance with the uninsured/underinsured motorist statutes is not required." If the district court got that right, whether Ms. Kingston received the notices and made the waivers required by the UIM statute makes no difference. The Kingstons challenge this ground for the court's ruling. As explained above, even if this challenge succeeded, reversal would not result. But in any event, their challenge falls short.

---

5. The Kingstons do not dispute this reading of the Umbrella Policy.

¶43    The Kingstons contend that because the Umbrella Policy "actually covers damages caused by uninsured/underinsured motorists, it would be logical to apply the uninsured/ underinsured motorist statute to such a policy." They acknowledge that "Utah has not determined whether or not an umbrella policy such as the one at issue here is covered by UM/UIM coverage statutes." But, they assert, other states have done so. Under their analysis, the Umbrella Policy would be subject to the requirement that it include "underinsured motorist coverage under Section 31A-22-305.3, unless affirmatively waived." *See* Utah Code Ann. § 31A-22-302(1)(c) (LexisNexis Supp. 2008). In other words, the Kingstons would be entitled by operation of law to additional UIM coverage—perhaps as much as $1,000,000.

¶44    State Farm responds that "creation of the UIM statute had nothing to do with umbrella policies," that the statute evinces no clear legislative intent to apply to umbrella policies, and that a "strong majority" of state courts hold that UM/UIM requirements do not apply to umbrella policies.

¶45    We conclude that the Kingstons have not shown that the full panoply of protections found in the UIM statute apply to an umbrella policy on the ground that it supplements the UIM coverage of an insured's automobile policy. Such a showing would require an analysis of the text of section 31A-22-305.3 and of the specific provisions of the Umbrella Policy. The parties have not engaged in this level of analysis. For example, the Kingstons have not identified the portion of the statute that they contend refers to umbrella policies. And while they refer to the Umbrella Policy application, they point to no provision of the Umbrella Policy itself that would allow us to conclude that the Umbrella Policy meets the statutory requirements of an automobile insurance policy. *See id.* § 31A-22-303(1)(a). We are unwilling to adopt a new and expansive reading of the UIM statute without adequate briefing of the issue.

¶46    Furthermore, our review of the law of other states suggests that umbrella policies differ from the automobile insurance policies referred to in UM/UIM statutes. For example, the Supreme Judicial Court of Maine rejected a similar argument in *Dickau v. Vermont Mutual Insurance Co.*, 2014 ME 158. There, the insured, Dickau, urged the court to interpret the term "motor vehicle insurance policies" in Maine's UM statute "to include any policy that contains *any* provision for any coverage of a motor vehicle, including umbrella policies." *Id.* ¶ 32 (emphasis in original). The court stated, "Because this interpretation would require us to ignore the history of insurance law, set aside the meaning of well-established terms of art, and reject the counsel of dozens of decisions from other jurisdictions, we decline to interpret 'motor vehicle insurance policies' in [Maine's UM statute] as Dickau suggests." *Id.*

¶47    The court noted, "On numerous grounds, a majority of jurisdictions treat 'automobile or vehicle insurance,' or some derivation thereof, as a term of art with a meaning distinguishable from the references to motor vehicles found in an umbrella policy." *Id.* ¶ 33 (citations omitted). The court continued, "A motor vehicle insurance policy describes the particular drivers and the particular vehicles for which the insurance is afforded, and its premiums are calculated with reference to the specific attributes of those vehicles and drivers—i.e., the age, condition, and safety features of the vehicles, and the age and accident history of the insured drivers." *Id.* In contrast, it noted, "Dickau's umbrella policy refers only to '[a]utos' in general, without describing any particular automobiles." *Id.* (alteration in original).

¶48    The court also observed that "motor vehicle insurance relates only to liability arising out of the use or ownership of motor vehicles. Dickau's umbrella policy, in contrast, insures him against liability stemming from activities associated with his use of watercraft and aircraft, as well as homeowners' liability

and general personal liability." *Id.* ¶ 35 (citation omitted). Additionally, "[m]otor vehicle insurance premiums, reflecting their status as primary insurance based on vehicle-specific liability, are also significantly higher than premiums for the catastrophic basic liability of umbrella policies." *Id.* ¶ 36 (citation omitted). "In summary," the court concluded, "the very nature of UM coverage differs from that of umbrella coverage. UM coverage is 'first-party coverage' in that it pays an amount to the insured based on a third party's liability; umbrella coverage is third-party coverage, payable to a third party based on the insured's liability." *Id.* ¶ 37 (citations omitted).

¶49 Finally, here the fact that State Farm Automobile Insurance Company issued the Automobile Policy whereas State Farm Fire and Casualty Company issued the Umbrella Policy underscores the difference in the character of the two policies.

¶50 In sum, because the Kingstons challenge the district court's ruling on the Umbrella Policy on only one of the court's two "independent alternative grounds," *see Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 28, 297 P.3d 38, they have not shown that the district court erred in granting partial summary judgment for State Farm on this issue. Furthermore, even if the district court's ruling rested solely on its backup rationale, the Kingstons have not demonstrated error in that rationale.

CONCLUSION

¶51 We affirm the order of the district court in all respects.

———————