2011 UT 22

**Mark HESS and Marilyn Hess, Plaintiffs and Appellees,**

v.

**CANBERRA DEVELOPMENT COMPANY, LC and David J. Allen, Defendants and Appellants.**

No. 20090266.

Supreme Court of Utah.

April 26, 2011.

Rehearing Denied June 14, 2011.

---

Stephen Quesenberry, Charles L. Perschon, Provo, for plaintiffs.

Bruce R. Baird, Dallis A. Nordstrom, Salt Lake City, for defendants.

Associate Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 In 2004, Appellees, Mark and Marilyn Hess (collectively, the "Hesses") purchased an undeveloped lot of land from Canberra Development Company, LC ("Canberra"), located in a subdivision owned and developed by Canberra. After constructing a home on the lot and moving into it, the Hesses began to notice several structural problems, including large cracks in the home's floor. A short time later, the Hesses learned that these problems resulted from excessive settling of the home caused by unstable soil beneath its foundation. Subsequently, the Hesses discovered that Canberra and its chief executive officer, David Allen (collectively, the "Developers"), had failed to inform them of a soils report the Developers had received seven years prior to selling the lot. This report indicated the presence of collapsible soil within the development and, specifically, within a test pit located in the Hesses' back yard.

¶ 2 Upon learning of this report and the Developers' failure to disclose its findings, the Hesses filed a lawsuit against the Developers seeking compensatory and punitive damages for fraudulent nondisclosure and fraudulent misrepresentation. At the conclusion of a jury trial, the Developers were found liable on both claims, and the Hesses were awarded $536,750.50 in economic damages and $2,625,000 for pain and suffering. No punitive damages were awarded. After the trial, the Developers filed several post-verdict motions, including a motion for judgment notwithstanding the verdict ("JNOV") on the fraudulent nondisclosure claim and a motion for a new trial or remittitur on the amount of damages awarded by the jury. The district court ultimately denied these motions.

¶ 3 Although the Developers purport to raise numerous issues on appeal, only three are adequately briefed, and we address only those three. First, we must determine whether the district court erred when it denied the Developers' motion for JNOV on the Hesses' fraudulent nondisclosure claim. Second, we must decide whether the district court erred when it declined to give the jury an instruction that the Developers proposed concerning intervening and superseding causes. Finally, we must determine whether the district court erred when it denied the Developers' motion for remittitur or a new trial based on the amount of economic damages awarded by the jury.

¶ 4 We first hold that the jury had sufficient evidence to find the Developers liable to the Hesses for fraudulent nondisclosure. Accordingly, we affirm the district court's denial of the Developers' motion for JNOV on the Hesses' fraudulent nondisclosure claim. Second, because intervening and superseding causes are not a defense to intentional torts, we hold that the district court did not err when it declined to give the jury the Developers' proposed instruction. Finally, because the damages awarded by the jury exceeded the amount of damages proven by the Hesses at trial, we hold that the district court erred when it denied the Developers' motion for a new trial or remittitur on the amount of economic damages. Thus, to accurately reflect the evidence presented by the Hesses, we reduce the amount of economic

damages awarded by the jury from $536,750.50 to $330,057.30.

## BACKGROUND

■ ¶ 5 " 'On appeal, we recite the facts from the record in the light most favorable to the jury's verdict.' "[1] In 1997, Canberra, headed by David Allen—its CEO, manager, registered agent, and majority owner—began developing a thirty-five-acre residential subdivision (the "Development") in Lindon City, Utah. As part of the Development's plat-approval process, Lindon City required that the Developers obtain a geotechnical soil investigation of the property. To comply with this requirement, the Developers hired Applied Geotechnical Engineering Consultants, Inc. ("AGEC").

### A. The AGEC Report

¶ 6 After concluding its investigation, AGEC prepared a report of its findings (the "AGEC Report" or "Report"). At the time the AGEC Report was prepared, the layout of the Development—including the individual lots, streets, and parks—had not yet been established. Although the AGEC Report included a general assertion that Canberra's land was suitable for the proposed residential development, it specifically warned of an erratic occurrence of highly collapsible soil in the Development and set forth precautions owners should take when building homes on this soil. The Report's conclusions section included the following statements: (1) "Moisture sensitive soils have been reported in the area. Precautions with respect to constructing in moisture sensitive soil areas are included in this report"; and (2) "The site is suitable for the proposed residential development. Recommendations contained in this report should be carefully followed."

¶ 7 Additionally, another section of the Report, titled "Collapsible Soil Considerations," indicated that "[t]he collapse potential of the soils at the project site" ranged from *"very low to high,"* with "localized areas of collapsible soils." The AGEC Report also indicated that the moisture-sensitive clay and silt soils

were spread throughout the Development with "known erratic occurrence" and that owners should be "aware of the potentially moisture sensitive soils in the area."

¶ 8 While most of the AGEC Report related to the Development as a whole, the Report included a figure identifying the location and soil composition of twelve "test pits" AGEC used to conduct its study. One of these test pits—test pit twelve—was drilled in an area that would later become the backyard of Lot 41. AGEC's analysis indicated that test pit twelve contained layers of clayey and silty soil, which the Report warned were susceptible to collapse because of their sensitivity to moisture.

¶ 9 After receiving the AGEC Report, Mr. Allen "read through [it]" and paid particular attention to the conclusions section, which he was "very interested in."

### B. The Hesses Purchase Lot 41 and Build a Home

¶ 10 In early 2004, the Hesses drove through Lindon City looking for a place to purchase land to build their dream home. During their search, the Hesses obtained a brochure that contained a map of the Development and listed lots that were for sale. After reviewing the brochure, the Hesses contacted Canberra's vice president and exclusive real estate agent, Steven Tanner. In February 2004, the Hesses met with Mr. Tanner and negotiated to purchase Lot 41 from Canberra for $150,000. On February 21, 2004, Mr. Hess signed a real estate purchase contract ("REPC") and a Seller Property Condition Disclosure form (the "Disclosure Form"). Mr. Allen initialed and signed both the REPC and the Disclosure Form two days later.

¶ 11 In addition to addressing Lot 41's desirability generally, the Disclosure Form included two questions specifically relating to Lot 41's subsurface soil conditions. First, the Disclosure Form asked, "Is there any fill or expansive soil on the property?" In response to this question, Mr. Tanner marked

---

1. *Smith v. Fairfax Realty, Inc.,* 2003 UT 41, ¶ 3, 82 P.3d 1064 (quoting *Diversified Holdings, L.C.* *v. Turner,* 2002 UT 129, ¶ 2, 63 P.3d 686).

a box indicating that the answer was "[u]nknown." Second, the Disclosure Form asked whether there was "anything else which [the sellers] should disclose to the Buyer because it may materially or adversely affect the value or desirability of the property." Mr. Tanner did not respond to this question, instead leaving this section of the Disclosure Form blank.

¶ 12 In April 2004, the transaction closed, and the Developers conveyed Lot 41 to "Mark and Marilyn Hess, husband and wife, as joint tenants" via warranty deed. At no time prior to closing did Canberra, Mr. Allen, or Mr. Tanner provide a copy of the AGEC Report to the Hesses or inform them of the presence of collapsible soil in the Development or test pit twelve.

¶ 13 In March 2004, the Hesses hired GTS Construction ("GTS") to build a home for them on Lot 41. In January 2005, GTS completed construction on the home, and the Hesses moved in.

### C. The Hesses' Home Settles

¶ 14 Shortly after moving into their home, the Hesses began to notice several structural problems. Initially, these problems appeared to be minor and included mostly sticking doors, but with time the problems became more severe. For example, in March 2005, Mr. Hess noticed large cracks in the home's flooring that spanned the length of its foundation. The Hesses also began to hear various noises in the house, which Mrs. Hess described as being similar to the sound of children slamming cupboard doors. These problems grew worse every time it rained or the ground became wet. As a result of the home's structural damage, the Hesses endured countless heating and cooling issues, pest infestations, midnight explosions of shattering windows, and a significant financial strain caused by efforts to keep their home habitable.

¶ 15 In April 2005, after several failed attempts to fix the damage, the Hesses hired Earthtec Testing and Engineering ("Earthtec") to investigate the source of the home's problems. During its investigation, Earthtec excavated two test pits to examine the soil conditions below the Hesses' home and discovered that part of the house was built on collapsible soil. After concluding its investigation, Earthtec informed the Hesses that "[t]he most likely cause of the differential movement the home ha[d] experienced [was] the collapse and consolidation in the clay soils which [were] observed approximately two feet below the bottom of the footings on the west side of the home." Additionally, sometime during its investigation, Earthtec learned of the AGEC Report and the information it contained. Based on their independent findings and the information contained in the AGEC Report, Earthtec suggested that the Hesses consider installing "mini piers" to support the west and southwest sides of their home.

¶ 16 Pursuant to Earthtec's recommendation, the Hesses hired Intermountain Helical Piers to install two piers beneath their home. But even after the two piers were installed, the Hesses' home continued to settle. Frustrated with these results, Mr. Hess contacted another foundation repair company, Atlas Piers ("Atlas"). After examining the Hesses' home, Atlas recommended that an additional one hundred piers be installed to anchor and support it. At the time, however, the Hesses could only afford to pay Atlas to install sixteen piers, which Atlas did. Later, in the summer of 2008, the Hesses rehired Atlas to install the additional eighty-four piers. Installing the eighty-four piers took approximately four weeks. After all the piers were installed, the Hesses' home was raised, in some areas as much as five and one-half inches. Throughout the installation and raising process, the Hesses continued to live in their home.

### D. The Hesses Sue the Developers and Prevail

¶ 17 In October 2005, the Hesses filed a lawsuit against their builder, GTS, and its principal agent. Sometime thereafter, the Hesses amended their complaint to include claims against the Developers. Prior to trial, the Hesses' claims against their builder, GTS, and its principal agent were settled, leaving only their claims against the Developers.

¶ 18 In 2008, the case against the Developers was scheduled for a jury trial. In anticipation of trial, the Developers and the Hesses submitted several proposed jury instructions to the district court. One of the instructions proposed by the Developers stated,

> Canberra or David Allen claim that they are not liable to the Hesses because of the later fault of the contractors and builders. To avoid liability for the harm, Canberra or David Allen must prove all the following: 1) That the contractors' and builders' conduct occurred after Canberra or David Allen; 2) That a reasonable person would consider the contractors' and builders' conduct extraordinary; 3) That Canberra or David Allen could not foresee that the contractors and builders would act in a negligent manner; and 4) That the harm resulting from the contractors' and builders' conduct was different from the type of harm that could reasonably be expected from Canberra or David Allen's conduct.

The district court did not include this language in its final draft of the jury instructions.

¶ 19 In October 2008, a four-day jury trial was held to resolve the Hesses' claims. Without attempting to provide a complete list, we note that the Hesses presented the following evidence at trial. First, the Hesses called witnesses who testified regarding the damage to their home, the soil conditions beneath the home, and the information contained in the AGEC Report. Second, the Hesses submitted a copy of the AGEC Report and a drawing demonstrating that test pit twelve was located on their lot. Third, the Hesses showed they had spent $221,878.18 to discover the source of their home's problems and to make repairs to it prior to trial. Fourth, the Hesses submitted a bid showing they needed another $108,179.12 to make additional repairs to the home after trial. Finally, the Hesses each testified regarding the condition of their home, the fear and anxiety they experienced while living in the home, and the overall impact the home's problems had on their quality of life.

¶ 20 Following the presentation of the Hesses' case, the Developers moved to dismiss Mrs. Hess's claims for fraudulent misrepresentation and fraudulent nondisclosure. In support of this motion, the Developers argued that they never communicated with or made any misrepresentations to Mrs. Hess regarding the sale or conditions of Lot 41. After hearing argument on the motion, the district court dismissed Mrs. Hess's claim for fraudulent misrepresentation, but allowed her claim for fraudulent nondisclosure to go to the jury. After the court's ruling, the Developers presented evidence rebutting the Hesses' claim for fraudulent nondisclosure and Mr. Hess's claim for fraudulent misrepresentation.

¶ 21 At the conclusion of the trial, the jury found the Developers liable to the Hesses for fraudulent nondisclosure and to Mr. Hess for fraudulent misrepresentation. The jury awarded the Hesses $536,750.50 in economic damages—$206,693.20 more than the Hesses demonstrated needing or spending to investigate and repair the home—and $2,625,000 in noneconomic damages for pain and suffering.

¶ 22 After the jury's verdict, the Developers filed several motions, including motions for JNOV, for a new trial, and for remittitur of the damages awards. The district court ultimately denied each of these motions.

### E. The Developers Appeal

¶ 23 On appeal, the Developers raise numerous challenges to the jury's verdict and the district court's denials of their motions. First, the Developers argue that the district court should have granted their motions for JNOV because the jury did not have sufficient evidence to find them liable for fraudulent nondisclosure or fraudulent misrepresentation. Second, they contend that the district court erred in ruling that the Hesses were not required to present expert testimony to establish the standard of care required of developers. Third, the Developers argue that the district court should have dismissed Mrs. Hess's claim for fraudulent nondisclosure because Mrs. Hess was not a party to the REPC and never engaged in any conversations with the Developers concerning the sale of Lot 41. Fourth, they argue that the

district court erred by not giving the jury the instruction they proposed regarding the effect that intervening and superseding causes could have on their potential liability to the Hesses. Finally, the Developers contend that the district court should have granted their motion for a remittitur or new trial because (1) the jury's award of damages for mental or emotional distress was so excessive as to be the result of passion or prejudice, (2) the jury's award of actual damages was excessive and not supported by the evidence, (3) the jury's allocation of fault was unreasonable, and (4) the district court refused to advise the jury of how much had been paid to the Hesses in the settlement with GTS.

¶ 24 In response, the Hesses argue that the Developers have failed to sufficiently marshal the evidence needed to overturn the jury's verdict and, in the alternative, that the evidence presented at trial supported the jury's findings of liability. Additionally, the Hesses contend that the district court properly denied the Developers' motion to dismiss Mrs. Hess's fraudulent nondisclosure claim, motion for JNOV, and motion for a new trial or remittitur. We have jurisdiction to hear this appeal pursuant to section 78A–3–102(3)(j) of the Utah Code.

## ANALYSIS

¶ 25 Although the Developers purport to raise a multitude of issues at the outset of their brief, they have adequately briefed only three. We have repeatedly warned that this court " 'will not address arguments that are not adequately briefed,' " [2] and that we are not " 'a depository in which the appealing party may dump the burden of argument and research.' " [3] To satisfy our adequate briefing requirement, a party's brief must contain " 'meaningful legal analysis.' " [4] Specifically, "[a] brief must go beyond providing conclusory statements and

'fully identify, analyze, and cite its legal arguments.' " [5] Meaningful "analysis 'requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority.' " [6]

¶ 26 The Developers' briefing on six of the issues identified at the outset of their brief fails to meet this standard. These inadequately briefed issues include (1) whether there was sufficient evidence for the jury to find that the "Appellants intentionally and fraudulent[ly] failed to disclose material information or made a fraudulent misrepresentation"; (2) whether the district court should have dismissed Mrs. Hess's claim for fraudulent nondisclosure on the grounds that Mrs. Hess was not a party to the REPC and never engaged in any conversations with the Developers concerning the sale of Lot 41; (3) whether the size of the jury's award of non-economic damages constituted a due process violation; (4) whether the district court erred in refusing to grant a remittitur or new trial on the ground that the jury's award of damages for mental or emotional distress was so excessive as to be the result of passion or prejudice; (5) whether the district court erred in refusing to advise the jury of how much had been paid in settlement by other defendants, thus allowing the Hesses a double recovery; and (6) whether the jury's allocation of fault was unreasonable. With respect to four of these issues—numbers one, two, three, and four—the Developers have either completely failed to offer any argument or analysis, or have only offered conclusory arguments without any citation to authority. On the other issues—numbers five and six—the Developers have offered only bald citation to authority and conclusory statements without any meaningful analysis. Neither of these approaches satisfies our adequate briefing requirements.[7]

**2.** See, e.g., Carrier v. Salt Lake Cnty., 2004 UT 98, ¶ 43, 104 P.3d 1208 (quoting State v. Thomas, 961 P.2d 299, 304 (Utah 1998)).

**3.** W. Jordan City v. Goodman, 2006 UT 27, ¶ 29, 135 P.3d 874 (quoting State v. Jaeger, 1999 UT 1, ¶ 31, 973 P.2d 404).

**4.** Id. (quoting State v. Gamblin, 2000 UT 44, ¶ 7, 1 P.3d 1108).

**5.** Id. (quoting State v. Green, 2005 UT 9, ¶ 11, 108 P.3d 710).

**6.** Id. (quoting Jaeger, 1999 UT 1, ¶ 31, 973 P.2d 404).

**7.** See id.

¶ 27 Given the inadequacy of the Developers' briefing on these issues, we are left with only three issues to resolve. First, we must determine whether the district court erred when it denied the Developers' motion for JNOV on the Hesses' fraudulent nondisclosure claim. Second, we must decide whether the district court erred when it declined to provide the jury with the Developers' proposed instruction regarding the effect of intervening and superseding causes on a developer's potential liability to a buyer. Finally, we must determine whether the district court erred when it refused to grant a remittitur or new trial based on the amount of economic damages awarded by the jury. As explained below, we affirm the district court on all issues except its failure to reduce the amount of economic damages awarded by the jury.

## I. THE DISTRICT COURT DID NOT ERR IN REJECTING THE DEVELOPERS' MOTION FOR JNOV ON THE FRAUDULENT NONDISCLOSURE CLAIM

¶ 28 Because the jury had sufficient evidence to find the Developers liable for fraudulent nondisclosure, we affirm the district court's denial of the Developers' motion for JNOV on the Hesses' fraudulent nondisclosure claim. On appeal, the Developers argue that the district court should have granted their motion for JNOV because the jury did not have sufficient evidence to support its verdict. To successfully attack a district court's refusal to grant a motion for JNOV based on insufficient evidence, " 'an appellant must marshal all the evidence supporting the verdict and then demonstrate that, even viewing the evidence in the light most favorable to that verdict, the evidence is not sufficient to support it.' " [8] Once an appel-

lant has satisfied his burden to marshal the evidence, we review all of the evidence presented at trial in the light most favorable to the verdict to determine whether that evidence is sufficient to support the jury's verdict.[9] In making this determination, we must draw "[a]ll reasonable inferences ... in favor of the verdict" and when the evidence "supports the verdict, we will affirm." [10] We will reverse a district court's denial of a motion for JNOV based on insufficient evidence only when the marshaled evidence "so clearly preponderates in favor of the ... appellant that reasonable people would not differ on the outcome of the case." [11]

¶ 29 To prevail on a claim of fraudulent nondisclosure, a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal *duty* to communicate information, (2) the defendant *knew* of the information he failed to disclose, and (3) the nondisclosed information was *material*.[12] Here, the Developers do not challenge the jury's findings that they knew of the AGEC Report and its statements that collapsible soil had been identified in the Development. Similarly, the Developers do not challenge the jury's finding that the information contained in the AGEC Report was material. Instead, the Developers argue only that the jury did not have sufficient evidence to find that they owed a duty to the Hesses to disclose the information contained in the AGEC Report.

¶ 30 At the trial below, the Developers and the Hesses agreed to jury instructions explaining the duty element of a fraudulent nondisclosure claim.[13] These jury instructions set out three duties under which a developer may be required to communicate information to a purchaser of his property.

---

8. *Pratt v. Prodata, Inc.*, 885 P.2d 786, 788–89 (Utah 1994) (quoting *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985)).

9. *See id.*

10. *Steenblik v. Lichfield*, 906 P.2d 872, 875 (Utah 1995).

11. *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 29, 48 P.3d 968 (internal quotation marks omitted).

12. *See Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 10, 143 P.3d 283.

13. Because both parties submitted jury instructions containing nearly identical language, and because neither party challenges the accuracy of these instructions on appeal, we do not address whether the instructions given to the jury contained accurate statements of law regarding the duties owed by developers with respect to a claim of fraudulent nondisclosure.

First, the instructions stated that, upon inquiry, a developer has a "duty to disclose . . . information he has developed in the course of the subdivision process which is relevant to the suitability of the land for its expected use." Second, the instructions provided that as sellers of real property, developers "have a duty to disclose material known defects that cannot be discovered by an ordinary, prudent buyer." This instruction also explained that "[a]n ordinary, prudent buyer is not required to hire numerous experts to search for hidden defects, but this does not mean that inspection by an expert will never be required." Finally, the agreed-upon jury instructions stated that "[a] developer, subdivider, or person performing similar tasks has a duty to . . . disclose to his purchaser any condition which he knows or reasonably ought to know makes the subdivided lots unsuitable for . . . residential building."

¶ 31 Based on these instructions, the jury's task was to determine whether the Developers (1) received an inquiry regarding Lot 41 and had information relevant to Lot 41's suitability for its expected use; (2) knew of a material defect on Lot 41 that could not be discovered by an ordinary, prudent buyer; or (3) knew or reasonably should have known of a condition that made Lot 41 unsuitable for residential development.

¶ 32 With respect to these issues, the jury was presented with the following evidence. First, the jury heard testimony regarding the information contained in the AGEC Report and had a copy of the Report to review during deliberations. Second, the jury heard testimony from Mr. Allen, Canberra's CEO, who stated that he had read through the AGEC Report and paid particular attention to its conclusions section. Third, the jury heard testimony and received exhibits demonstrating that test pit twelve contained collapsible soil and was located on Lot 41—the lot the Hesses purchased. Finally, the jury heard testimony about and received an admitted copy of the Disclosure Form.

¶ 33 Viewing this evidence and drawing all reasonable inferences based thereon in the light most favorable to the verdict, we conclude that the jury had sufficient evidence to determine that the Developers (1) received an inquiry regarding Lot 41 and had information relevant to its suitability for its expected use and (2) knew of a material defect on Lot 41 that would not be discovered by an ordinary, prudent buyer.[14]

¶ 34 First, the jury could have reasonably determined that the question on the Disclosure Form—"[i]s there anything else which you should disclose to Buyer because it may materially or adversely affect the value or desirability of the Property"—constituted an inquiry. The jury could have also reasonably determined that the presence of collapsible soil in the Development, and specifically in test pit twelve, was relevant to the suitability of Lot 41 for its expected use.

¶ 35 Second, based on the evidence that Mr. Allen read the AGEC Report, that test pit twelve contained collapsible soil, and that test pit twelve was located on the Hesses' property, the jury could have reasonably found that the Developers knew of a material defect on Lot 41—the presence of collapsible soil. Additionally, based on the testimony it heard regarding the Hesses numerous efforts to discover the cause of their home's structural defects and the substantial cost of these efforts, the jury could have reasonably inferred that the presence of collapsible soil below the Hesses' home was the type of material defect that would not be discovered by an ordinary, prudent buyer. This is particularly true where the jury was specifically instructed that in most situations "[a]n ordinary, prudent buyer is not required to hire numerous experts to search for hidden defects."

¶ 36 Notably, the Developers argue that they could not have known that test pit twelve was located on Lot 41 because the layout of the Development—including its individual lots, streets, and parks—had not been established at the time the AGEC Re-

14. Because we conclude the jury had sufficient evidence to find that these two duties were triggered, we need not address whether the jury would have had sufficient evidence to determine that the Developers knew or reasonably should have known that Lot 41 was unsuitable for residential development or whether such a finding would require expert testimony.

port was issued. We find this argument unpersuasive. As an initial matter, even if the jury believed that the Developers did not know test pit twelve was located on Lot 41 when they first received the Report, given the ease with which this information could have been obtained, the jury could have reasonably inferred that the Developers knew of this fact before conveying Lot 41 to the Hesses seven years later. Furthermore, if we were to accept the Developers' argument and refuse to allow the jury to draw this inference, we would encourage developers to remain ignorant of, and to not take steps to pinpoint the specific locations of, *known* collapsible soil within their project sites. This we will not do.

¶ 37 In sum, viewing the evidence presented at trial, and drawing all reasonable inferences based thereon in the light most favorable to the verdict, we conclude that the evidence presented at trial does not "so clearly preponderate[ ] in favor of the [Developers] that reasonable people would not differ on the outcome of the case."[15] Accordingly, we hold that the Developers have failed to meet their burden to reverse the district court's denial of their motion for JNOV on the fraudulent nondisclosure claim.

## II. THE DISTRICT COURT DID NOT ERR WHEN IT DECLINED TO GIVE THE JURY THE DEVELOPERS' PROPOSED INSTRUCTION CONCERNING INTERVENING AND SUPERSEDING CAUSES

¶ 38 The district court did not err when it declined to give the jury the Developers' proposed instruction regarding intervening and superseding causes and their effect on a developer's potential liability to a purchaser. A district court's refusal to pro-

vide a specific jury instruction is a question of law and is reviewed for correctness.[16] Errors with regard to jury instructions "require reversal only if confidence in the jury's verdict is undermined."[17]

¶ 39 The Developers rely on our opinion in *Smith v. Frandsen*[18] to argue that the district court should have given the jury their proposed instruction regarding the effect of intervening and superseding causes on a developer's potential liability to his purchasers. In *Smith*, we noted that "the duties owed by . . . developers are not without limitation" and do "not continue indefinitely."[19] Further, we explained that *"[a]bsent intentional fraud,* [a developer's duty] 'continues only until the [buyer] . . . ha[s] had adequate time and opportunity, through occupation of the land or otherwise, to discover the existence of the condition, and to take effective precautions against it by repair or other means.' "[20]

¶ 40 In relying on this language to support their argument, the Developers fail to recognize that the intervening and superseding acts of a buyer or builder disrupt a developer's liability *only* in cases *not* involving intentional fraud.[21] Here, the only claims submitted to the jury alleged fraud on the part of the Developers. Thus, it would have been inappropriate and potentially confusing for the district court to give the jury an instruction concerning intervening and superseding causes. Accordingly, we affirm the district court's decision not to provide the jury with the Developers' proposed instruction.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO REMIT THE AMOUNT OF ECONOMIC DAMAGES AWARDED BY THE JURY

¶ 41 Because the economic damages awarded by the jury exceeded the amount of

15. *Brookside Mobile Home Park*, 2002 UT 48, ¶ 29, 48 P.3d 968 (internal quotation marks omitted).

16. *Brewer v. Denver & Rio Grande W.R.R.*, 2001 UT 77, ¶ 38, 31 P.3d 557.

17. *Tingey v. Christensen*, 1999 UT 68, ¶ 16, 987 P.2d 588.

18. 2004 UT 55, 94 P.3d 919.

19. *Id.* ¶ 17.

20. *Id.* (emphasis added) (quoting Restatement (Second) of Torts § 353 cmt. g (1965)).

21. *See id.; see also Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 804 (Utah 1980) (concluding that negligence-based defenses, like intervening and superseding causes, are not proper defenses to intentional torts).

economic damages proven by the Hesses at trial, the district court erred when it denied the Developers' motion for a new trial or remittitur on the amount of economic damages. Although "[j]uries are generally allowed wide discretion in the assessment of damages," [22] rule 59(a) of the Utah Rules of Civil Procedure permits a trial judge to grant a new trial or remittitur of damages when there is insufficient evidence to support the jury's damages award.[23] When reviewing a trial judge's decision to grant or deny a new trial or remittitur on the amount of actual damages, we apply an abuse of discretion standard.[24] "Under this standard of review, 'we will reverse only if there is no reasonable basis for the decision.' " [25]

¶ 42 As plaintiffs, the Hesses had the burden of proving their actual damages during trial.[26] To satisfy this burden, the Hesses presented the jury with detailed calculations showing they had spent $221,878.18 to discover the source of their home's problems and to make repairs to it prior to trial. They also presented evidence showing they needed another $108,179.12 to make additional repairs to the home after trial. Added together, these amounts equal $330,057.30.

¶ 43 Despite this total, the jury awarded the Hesses $536,750.50 in economic damages—$206,693.20 more than the Hesses showed they spent or needed to investigate and repair the home. Because we find no evidence in the record to support the jury's addition of $206,693.20 to the calculations presented by the Hesses at trial, we hold that the district court's denial of remittitur constituted an abuse of discretion. Accordingly, we reduce the Hesses' economic damages award to $330,057.30.

### CONCLUSION

¶ 44 We affirm the district court's (1) denial of the Developers' motion for JNOV on the fraudulent nondisclosure claim and (2) decision to not give the jury the Developers'

proposed instruction on intervening and superseding causes. To accurately reflect the evidence the Hesses presented at trial, we reduce the amount of economic damages awarded by the jury from $536,750.50 to $330,057.30.

¶ 45 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Judge McHUGH concur in Associate Chief Justice DURRANT's opinion.

¶ 46 Having disqualified himself, Justice LEE does not participate herein; Court of Appeals Judge CAROLYN B. McHUGH sat.

22. *Cornia v. Wilcox*, 898 P.2d 1379, 1386 (Utah 1995) (internal quotation marks omitted).

23. *See* Utah R. Civ. P. 59(a)(5)-(6).

24. *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 25, 82 P.3d 1064.

25. *Id.* (quoting *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 805 (Utah 1991)).

26. *See id.* ¶ 26.