*This opinion is subject to revision before
publication in the Pacific Reporter*

**2015 UT 35**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoption of J.M.S., a minor

JACOB DAVID BROOKS,
*Intervenor/Appellant,*

*v.*

A.S. and J.S.,
*Appellees.*

No. 20120683
Filed February 6, 2015

Fourth District, Provo Dep't
The Honorable Fred D. Howard
No. 122400005

Attorneys:

Wesley D. Hutchins, West Jordan, for appellant

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees

William C. Duncan, Lehi, amicus curiae, for Sutherland Institute

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, and JUSTICE PARRISH joined.

ASSOCIATE CHIEF JUSTICE NEHRING filed a concurring opinion.[1]

JUSTICE DURHAM filed a dissenting opinion.

JUSTICE LEE, opinion of the Court:

¶1    This case, like *Nevares v. M.L.S.*, 2015 UT 34, presents questions concerning the applicability and constitutionality of Utah Code section 78B-6-111. That provision forbids a biological father

---

[1] Associate Chief Justice Nehring acted on this case prior to his retirement.

from challenging an adoption when his child was conceived as a result of conduct that "would constitute any sexual offense" described in the Utah Criminal Code. In this case and in *Nevares*, the statutory question presented is whether this provision can properly be construed to encompass sexual conduct in another state that would have been criminal if engaged in in Utah. And in both cases the biological father also asserts that such application of section 111 would violate his constitutional right to due process of law.

¶2    We resolve this case on the basis of our opinion in *Nevares*. We hold that the "sexual offense[s]" described in section 111 do not encompass activities outside of Utah involving non-Utahns. And on the basis of that conclusion, we reverse the denial of the father's petition to intervene and remand for further proceedings not inconsistent with this opinion.

I

¶3    Jacob David Brooks and the birth mother, both Pennsylvania residents, conceived a child together in Pennsylvania. At the time, Brooks was eighteen and the birth mother was fourteen. Due to this age difference, the sexual relationship between the two of them was prohibited by Pennsylvania criminal law. *See* 18 PA. CONS. STAT. § 3122.1 (2014) (statutory sexual assault); *id.* § 3123(a)(7) (involuntary deviate sexual intercourse); *id.* § 3126(a)(8) (indecent assault). Brooks was later charged in Pennsylvania with statutory sexual assault and corruption of minors, but pled guilty to indecent assault, a misdemeanor.

¶4    Meanwhile, the birth mother made preparations to place the child for adoption in Utah. Brooks objected to these designs, though it is unclear whether he knew the planned location for the adoption. In time, the child was born and then relinquished for adoption twenty-four hours later. The adoptive parents filed an adoption petition in Utah, which Brooks became aware of two weeks later. Brooks subsequently filed paternity documents in both Utah and Pennsylvania, as well as a motion to intervene in the Utah adoption proceedings.

¶5    The Fourth District Court denied Brooks's motion to intervene, citing Utah Code section 78B-6-111. This section states,

> A biological father is not entitled to notice of an adoption proceeding, nor is the consent of a biological father required in connection with an adoption

> proceeding, in cases where it is shown that the child
> who is the subject of the proceeding was conceived
> as a result of conduct which would constitute any
> sexual offense described in Title 76, Chapter 5,
> Part 4, regardless of whether the biological father is
> formally charged with or convicted of a criminal of-
> fense.

*Id.* (emphasis added). According to the district court, Brooks's conduct constituted a sexual crime under Utah Code section 76-5-401, placing his conduct within section 78B-6-111's reach. For this reason, the district court found that Brooks had no right to contest the adoption. It thus denied his motion to intervene on that basis.

¶6 Brooks filed this appeal. In challenging the denial of his motion to intervene, Brooks raises legal questions concerning the interpretation and constitutionality of section 111. Our review is accordingly de novo. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, 308 P.3d 382.

II

¶7 A threshold question is whether the interpretation and constitutionality of section 111 are properly before us on appeal. That question implicates the law of preservation and of adequate briefing. For reasons set forth below, we hold that Brooks preserved these issues in the district court and adequately briefed them on appeal to this court.

¶8 First, both the statutory and constitutional aspects of Brooks's case were presented to the district court. In a memorandum filed with the district court, Brooks asserted that the key question is "whether Utah or Pennsylvania law applies" and argued that "Pennsylvania law should apply to this case." Later, at his hearing, Brooks argued that section 111 was "unconstitutional from a due process standpoint." And although he framed his constitutional arguments generally in terms of a concern about "forum shopping," he also asserted that a statute employed to "cut him out" of his parental rights was a "violation of due process."

¶9 Brooks's counsel's statutory and constitutional arguments in the district court were relatively superficial. Thus, instead of presenting a careful analysis of the questions of statutory and constitutional interpretation presented, Brooks's counsel devoted most of his energy to developing a factual record of what he saw

as the misdeeds of the adoption agency officials involved in the case. Specifically, in the district court and again on appeal, counsel presented extensive transcripts of telephone calls to the adoption agency, highlighting what counsel saw as the overly aggressive assertions and positions taken by the agency's representatives.[2] That tack was unproductive. Counsel would have been far better served staying focused on the legal questions at issue; the attempt to smear an opponent with a sideshow based on a sting operation was unhelpful.

¶10 That said, the legal questions presented are important, and counsel adequately preserved them below. Brooks raised both statutory and constitutional questions in the district court, and we therefore deem them preserved for purposes of appeal.

¶11 We likewise find these issues adequately briefed on appeal. In his opening brief on appeal, Brooks asserted that "the essence of the case" is that "[a]ppellees should not be permitted to rely on 78B-6-111, when Pennsylvania law should apply." And appellees, in their brief, responded to his statutory argument at some length. They asserted that "nothing in the language of Section 78B-6-111 limits its application to cases where the child was conceived in Utah," while insisting that "[w]hat is important is whether the father's sexual relationship with the birth mother consists of the type of conduct described under Title 76, Chapter 5, Part 4 of the Utah Code." That is the key statutory question in this case (and in *Nevares*).

¶12 The constitutional arguments were also advanced on appeal. Brooks asserted that even if his relationship could constitute a sexual offense in Utah, "he nevertheless has a *due process right* and other constitutionally protected rights relating to his rights to parent his biological child." The point was made even more forcefully at oral argument, where counsel asserted that "[t]his case re-

---

[2] Brooks's counsel apparently saw this as an opportunity to sway judicial sympathy in his favor. That was a misjudgment on his part. This is a court of law. And as judges we decide the cases that come before us in accordance with the governing provisions of the law, and not based on our sympathy for one of the parties or hostility toward another. Blatant attempts to stir bias against an opponent will often backfire.

ally revolves around . . . whether or not a sex crime . . . obviates any need whatsoever to give notice and an opportunity to be heard to an out-of-state biological father," and that denying Brooks's right to intervene "violates . . . due process" because "none of the parties had any connection whatsoever to Utah."

¶13 The briefing on the constitutional implications of section 111 was by no mean robust. But the constitutional question was presented, and an analysis of that issue aids our analysis of the threshold statutory question, which is properly preserved and argued on appeal. We accordingly proceed to the merits.

### III

¶14 The threshold question presented is whether Utah Code section 78B-6-111 applies to the sexual activity between Brooks and the birth mother of J.M.S. That provision forecloses the parental rights of a biological father where "the child who is the subject of the proceeding was conceived as a result of conduct which would constitute any sexual offense described in Title 76, Chapter 5, Part 4, regardless of whether the biological father is formally charged with or convicted of a criminal offense." UTAH CODE § 78B-6-111. The district court denied Brooks's motion to intervene on the ground that his child was "conceived as a result of conduct which would constitute" a sexual offense under Utah law.

¶15 We reverse on the ground that section 111 does not apply in this case. This conclusion follows from our analysis in *Nevares v. M.L.S.*, 2015 UT 34, ¶¶ 27–43, __P.3d__. As we concluded there, "section 111 is not implicated where, as here, the conduct in question could not have 'constitute[d] a sexual offense' under the referenced part of the Utah code because the activity involved non-Utahns outside of Utah, and thus could not have sustained a criminal charge under Title 76, Chapter 5, Part 4." *Id.* ¶ 28 (alteration in original).

¶16 Our *Nevares* opinion based that determination on three grounds: "(1) the statute's 'regardless' clause, which suggests (when read in light of semantic canons of construction) that *all matters* sufficient to sustain a 'formal[] charge[]' or 'convict[ion]' must be established to trigger section 111; (2) the well-settled presumption against extraterritorial application of statutory provisions, which counsels in favor of limiting section 111 to offenses committed in Utah even if the statute were silent regarding its ap-

plication to conduct outside of Utah;[3] and (3) the canon of constitutional avoidance, which counsels in favor of limiting section 111 to offenses committed in Utah in light of the grave due process problems[4] associated with" the contrary construction.[5] *Id.* ¶¶ 30–46 (alterations in original).

---

[3] The concurrence asserts that section 111 "is not being applied extraterritorially" because it is "being applied within the state of Utah to a Utah adoption proceeding." *Infra* ¶ 25. But the conclusion does not follow from the premise. Most any question of extraterritoriality arises in a case in which a litigant is seeking to apply the forum state's law to another litigant's extraterritorial activity. *See Nevares*, 2015 UT 34, ¶ 35 (citing *U.S. Bond & Fin. Corp. v. Nat'l Bldg. & Loan Ass'n of Am.*, 17 P.2d 238, 239 (Utah 1932) (declining to apply Utah securities laws to "a contract made and executed in another state")); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 262–65 (2010) (holding that anti-fraud provision of federal securities statute did not apply extraterritorially to case involving foreign plaintiffs suing foreign and American defendants in federal court); *State v. Reed*, 709 P.2d 391, 392 (Utah 1985) (declining to give extraterritorial effect to Utah sentencing provision regarding concurrent sentences in case involving defendant subject to simultaneous sentence in California). Our holding, moreover, does not at all foreclose the application of Utah "adoption statutes" to a case involving "non-resident parents." *Infra* ¶ 25. Instead, as explained in *Nevares*, Utah adoption law remains intact and is properly applicable. *See Nevares*, 2015 UT 34, ¶ 49 & n.19. We simply construe section 111—a "law regulating sexual activity"—not to apply. *Id.* ¶ 49. And in its place we conclude that Pennsylvania law could be invoked, and that Utah adoption law would govern in all other respects. *See id*; *infra* ¶ 18.

[4] The dissent misperceives our analysis on this point. We reach no firm due process holding in *Nevares*; our point is simply that the application of section 111 to conduct lacking any jurisdictional nexus to Utah would introduce serious due process concerns. 2015 UT 34, ¶ 43. Our approach here is identical. Thus, we do not hold that that the extraterritorial application of section 111 violates the Due Process Clause, much less that "the state of Utah may be unable to make its own judgment as to whether Mr. Brooks's crime should disqualify him from intervening." *Infra* ¶ 37 (Durham, J.,

¶17 This analysis suffices to reverse the district court's determination in this case. Because section 111 has no application to Brooks's sexual activity in Pennsylvania, the district court erred in denying his motion to intervene under this provision.

IV

¶18 We reverse and remand on the basis of the above conclusions. In so doing, we do not hold that Brooks's motion should have been granted. We simply conclude that Utah Code section 78B-6-111 should not be read to foreclose his parental rights. And because we interpret section 111 not to apply to sexual conduct lacking any jurisdictional nexus to Utah, we need not and do not reach the substantive due process question addressed by the dissent. *Infra* ¶ 33.

¶19 In *Nevares,* we acknowledged the existence of legal means other than section 111 for a birth mother or adoptive parent to seek to terminate a father's parental rights on the basis of sexual misconduct. 2015 UT 34, ¶¶ 48–50. We concluded, specifically, that the law of the state in which a child was conceived could apply insofar as it provides for the termination of parental rights of a

---

dissenting). Our holding is rooted in our interpretation of section 111. We leave for another day the question of the legislature's constitutional authority to dictate the effect of criminal activity on a father's right to intervene. And, as explained below, we identify provisions of Pennsylvania and Utah law that may operate in cases, like this one, where section 111 is inapplicable. *See infra* ¶ 18; *Nevares*, 2015 UT 34, ¶¶ 48–49 (articulating a choice of law basis for application of provisions of Utah law and of the state in which the father's sexual activity occurred).

[5] The concurrence criticizes our approach—of offering both an interpretation of the terms of section 111 and a constitutional avoidance argument as an alternative—as somehow a "disservice" to the "legal community." *Infra* ¶ 27. We see it differently. Alternative arguments have long been a standard convention in judicial opinions. They often aid in elucidating multiple points that combine to persuade the court of the basis for its conclusion. We present them in that spirit here.

father of a child conceived as a result of criminal misconduct.[6] *Id*. ¶¶ 48–49. Here the applicable law would be a Pennsylvania statute, 23 PA. CONS. STAT. § 2511 (2014). That provision has not yet been invoked in this case, but we flag it as potentially applicable if the parties should wish to raise it on remand.

¶20  For this reason, we see no basis for the dissent's conclusion that "Mr. Brooks's sexual contact with J.M.S.'s mother was a serious felony where it occurred." *Infra* ¶ 33. Brooks has never been afforded any due process on that matter. He pled guilty to a lesser offense in Pennsylvania. But no court has ever determined whether he committed an offense triggering 23 PA. CONS. STAT. § 2511 (2014). We leave the matter for further proceedings on remand. And, if the parties raise this question, we note that the matter would be subject to proof by clear and convincing evidence. *See Santosky v. Kramer*, 455 U.S. 745, 756–57 (1982) (requiring proof of grounds for termination of parental rights by "clear and convincing evidence").

---

[6] Our holding does not "ignore[] the weighty interests at stake for the state of Utah" in an adoption proceeding, or foreclose the possibility of an amendment to section 111 aimed at protecting the interests identified by the dissent. *Infra* ¶ 36. Our holding here and in *Nevares* is based purely in statutory interpretation. So we do not foreclose the legislature's right to legislate in this important field. The legislature may make amendments as it sees fit— subject, of course, to the limitations of the constitution (which we do not resolve conclusively in these cases).

¶21 In remanding, we express no view as to the viability of any challenge raised under the cited Pennsylvania provision. And we resolve no other issues and express no view as to any other grounds that respondents may advance in response to Brooks's motion or that may arise in any subsequent proceedings regarding the adoption of the child in question.[7]

───────────

ASSOCIATE CHIEF JUSTICE NEHRING, concurring in judgment:

¶22 I respectfully concur in the judgment only. I disagree with the majority's interpretation of Utah Code section 78B-6-111. I believe the statute is ambiguous and therefore I would use the doctrine of constitutional avoidance to hold that section 111 applies only to conduct committed in-state.

¶23 First, unlike the majority, I do not believe the statute is elucidated by recourse to the *expressio unius est exclusio alterius* canon.[8] The majority's strained use of that canon makes it abun-

───────────

[7] *See, e.g.,* UTAH CODE § 78B-6-133(1) (calling for assessment of "whether proper grounds exist for the termination of . . . [parental] rights" of a person "whose consent for an adoption is required"); *id.* § 78B-6-133(2)(b), (3) (if parental rights are not terminated, calling for "an evidentiary hearing to determine who should have custody of the child" based on "the child's best interest," and considering "evidence of psychological or emotional bonds that the child has formed with a third person, including the prospective adoptive parent," and "any detriment that a change in custody may cause the child"); *id.* § 78B-6-133(5) (noting that a "custody order entered pursuant to this section may . . . (a) include provisions for: (i) parent-time; or (ii) visitation by an interested third party; and (b) provide for the financial support of the child").

[8] Because the relevant analysis in the instant case is incorporated by reference but actually appears in a separate case that also issued today, *Nevares v. M.L.S.*, 2015 UT 34, __ P.3d.__, I will cite *Nevares* throughout. *See supra* ¶ 15 ("We reverse on the ground that section 111 does not apply in this case. This conclusion follows from our analysis in *Nevares* . . . ."); *see also supra* ¶ 16 (sum-

dantly clear that though antiquated latin maxims are sometimes "useful guides," they make very "poor masters" and "should not be regarded as having any such rigidity as to . . . distort an otherwise natural meaning or intent."[9]  The statute states that it applies to *"conduct . . .* described in [Chapter 5, Part 4 of the Criminal Code], *regardless* of whether" such conduct is "formally" charged or results in a "convict[ion]."[10]  The natural reading of this language is precisely the opposite of what the majority concludes.[11]  In other words, the clearest way to read the statute as a whole is to say that the relevant conduct need not be susceptible to a formal charge and need not result in a conviction.  Surely the legislature did not add the "convict[ion]" caveat in order to get at innocent fathers—rather, it seems likely that they added that word to indicate that the provision applies to *conduct*, separate and independent of the requirements of criminal procedure.  Yet the majority cites the *expressio unius* canon to conclude that the "regardless" clause somehow means that the conduct must meet every requirement for a formal charge except that of actually being

---

marizing and incorporating the *Nevares* analysis, without additional explanation).

[9] *Salt Lake City v. Salt Lake Cnty.*, 568 P.2d 738, 741 (Utah 1977). *See also* BLACK'S LAW DICTIONARY 661-62 (9th ed. 2009) ("Several Latin maxims masquerade as rules of interpretation while doing nothing more than describing results reached by other means. The best example is probably *expressio unius est exclusio alterius*, which is a rather elaborate, mysterious sounding, and anachronistic way of describing the negative implication. *Far from being a rule, it is not even lexicographically accurate*, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds.  Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context." (second emphasis added) (internal quotation marks omitted)).

[10] UTAH CODE § 78B-6-111 (emphasis added).

[11] *See id.*; *supra* ¶ 15; *Nevares*, 2015 UT 34, ¶ 32.

charged.[12]  This seems to me a highly unnatural way to read the statutory language.

¶24  Canons of construction "are not formulaic, dispositive indicators of statutory meaning.  They are merely tools that guide our construction of statutes in accordance with common, ordinary usage and understanding of language . . . ."[13]  The majority employs *expressio unius* to read into the statute a requirement that "*all matters* sufficient to sustain a 'formal[] charge[]' or 'convict[ion]' must be established."[14]  I do not agree with that interpretation.  I think the majority has placed more weight on the canon of *expressio unius* than the concept can reasonably bear.  The majority's use of the *expressio unius* canon forces it to diverge significantly from the common, ordinary way one would read section 111, and I cannot agree with that analysis.

¶25  Second, I cannot join the majority in its analysis of the "presumption against extraterritorial effect."[15]  While there may be a presumption against applying statutes extraterritorially, Utah Code section 78B-6-111 is not being applied extraterritorially.  It is being applied within the state of Utah to a Utah adoption proceeding.  The majority's reasoning on this point strikes me as both unpersuasive and deeply concerning.  The notion that Utah adoption statutes are applied "extraterritorially" when they are applied to nonresident parents is dangerous and inaccurate.  We have long held that Utah adoption law properly controls an adoption within the state and I cannot join the majority's suggestion to the contrary.  I also object, generally, to the idea that we should delve into the supposed "backdrop" against which legislators make law.[16]  Unlike the majority in this case and *Nevares*, I would not ascribe any "intuitive sense" to the Utah Legislature,[17] but would instead rely on our well-established rules of statutory interpreta-

---

[12] *Supra* ¶ 16; *Nevares*, 2015 UT 34, ¶¶ 30–32.

[13] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 19, 248 P.3d 465.

[14] *Supra* ¶ 16 (alterations in original); *Nevares*, 2015 UT 34, ¶ 30.

[15] *Nevares*, 2015 UT 34, ¶¶ 35–36; *supra* ¶ 16.

[16] *Nevares*, 2015 UT 34, ¶ 36; *supra* ¶ 16 (incorporating *Nevares* analysis).

[17] *Nevares*, 2015 UT 34, ¶ 36.

tion, chief among which is that the "best evidence of the legislature's intent is the plain language of the statute itself."[18]

¶26   Mr. Brooks does not directly address whether section 78B-6-111 applies to unwed fathers whose conduct in conceiving a child occurred outside of Utah, beyond stating that "Pennsylvania law should apply"—a statement that enjoys no "reasoned analysis" or relevant authority,[19] but on the basis of which the majority "deem[s]" the issue both "preserved" and "adequately briefed."[20] Though Mr. Brooks only barely raised the argument, the majority notes that "appellees, in their brief, responded . . . at some length."[21]   In my view, it is not fair to allow an appellant to "dump the burden of argument and research"[22] on his opponent and the court.  Though I would reach the question of section 111's applicability as necessary to the resolution of the case, I would not characterize this issue as preserved[23] or adequately briefed, because it was neither.

---

[18] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (internal quotation marks omitted).

[19] *Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254 P.3d 161 (warning that to "satisfy our adequate briefing requirement," a brief "must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments" (internal quotation marks omitted)).

[20] *Supra* ¶¶ 10–11.

[21] *Supra* ¶ 11.

[22] *Hess*, 2011 UT 22, ¶ 25 (internal quotation marks omitted).

[23] *See Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 ("An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on [it]." (alteration in original) (internal quotation marks omitted)).  Because Mr. Brooks's due process argument was preserved, I would hold that we can address the question of Utah Code section 78B-6-111's applicability because it "bears upon the ultimate resolution" of an issue that has "properly been preserved" and is thus "necessary to a proper decision." *Id.* ¶¶ 18, 20.

A.C.J. NEHRING, concurring

¶27 I would hold that Utah Code section 78B-6-111 is ambiguous. When construing ambiguous statutes, we attempt to "avoid interpretations that conflict with relevant constitutional mandates."[24] This is a reflection of our duty to read "validity, constitutionality and sense" into an ambiguous statute, "if possible."[25] But we must employ the principle of constitutional avoidance cautiously. Over-zealous use of constitutional avoidance runs the risk of trampling on the intent of the legislature. In other words, "in the guise of judicial restraint the Court ought not to intrude upon the other branches."[26] Though a statute may present a serious constitutional problem, this alone "ought not to drive [the court] to an incorrect interpretation of the statute."[27] Therefore, the constitutional doubt rule must only be used when a statute is susceptible to competing constructions that are "fairly possible."[28] While I believe this is such a situation, I think the majority's use of the doctrine is inappropriate. The doctrine poses a great risk of misuse, and should only be employed when the court finds that a statute is genuinely susceptible to two constructions—but the majority does not do this. In my view, the majority should first acknowledge the statute's ambiguity and proceed with a constitutional avoidance analysis from there. The majority does the legal community a disservice by purporting to entertain two conflicting methods of statutory interpretation.[29] The statute is either ambiguous or it is not. I believe it is.

---

[24] *State v. Mooney*, 2004 UT 49, ¶ 12, 98 P.3d 420 (internal quotation marks omitted).

[25] *Munsee v. Munsee*, 363 P.2d 71, 85 (Utah 1961); *see also Utah State Rd. Comm'n v. Friberg*, 687 P.2d 821, 831 (Utah 1984).

[26] *Zadvydas v. Davis*, 533 U.S. 678, 705 (2001) (Kennedy, J., dissenting); *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 24, 332 P.3d 900 ("[F]or the constitutional avoidance canon to even apply, the statute must be genuinely susceptible to two constructions . . . ." (internal quotation marks omitted)).

[27] *Zadvydas*, 533 U.S. at 705-06 (Kennedy, J., dissenting).

[28] *Id.* at 707 (internal quotation marks omitted).

[29] I fail to see why the court would want to set out multiple mutually-exclusive theories of statutory meaning in order to "elu-

¶28    There are two ways of viewing Utah Code section 78B-6-111.  It could be read simply to apply to those who commit conduct that meets the elements of any of the twelve listed "sexual offenses" described in Chapter 5, Part 4, of the Utah Criminal Code.[30]  But it could also be read to apply only to conduct that would actually be *capable of prosecution* as a crime in Utah.  Section 111 states that

> [a] biological father is not entitled to notice of an adoption proceeding, nor is [his] consent . . . required in cases where it is shown that the child who is the subject of the proceeding was conceived as a result of *conduct which would constitute* any sexual offense described in Title 76, Chapter 5, Part 4, regardless of whether the biological father is formally charged with or convicted of a criminal offense.[31]

Here, the word "would"—which implies conditionality[32]—is ambiguous.  The use of "would" could be read to indicate that the section applies to any father who conceives a child by way of the conduct listed in Chapter 5, Part 4, wherever it occurs.  But the word "would" might have been included to reflect the fact that the statute applies to conduct that "would" be a crime "regardless" of whether the father were formally charged and convicted in Utah—and thus the statute might mean that the relevant "conduct" must at least be susceptible to formal charges in Utah,

---

cidat[e] multiple points that combine to persuade the court of the basis for its conclusion." *Supra* ¶ 16 n.5.  One correct theory is persuasive enough.  The court should simply "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)—not provide three different theories of what the law might be.

[30] *See* UTAH CODE §§ 76-5-401 to -415 (outlining twelve criminal sexual offenses, including "unlawful sexual activity with a minor," "rape," "rape of a child," "object rape," "forcible sodomy," "forcible sexual abuse," "aggravated sexual assault" and other related crimes).

[31] *Id.* § 78B-6-111 (emphasis added).

[32] WEBSTER'S THIRD NEW INT'L DICTIONARY 2637-38 (1961) (defining the word "would" and explaining that it is used "to express a contingency or a possibility").

meaning it would have to occur either "wholly or partly" in Utah.[33] In other words, the statutory language can plausibly be read to apply to either (1) any conduct that simply fits the descriptions contained in Chapter 5, Part 4 of the Utah Criminal Code, regardless of where that conduct occurred; or (2) conduct that is actually capable of prosecution as a crime in Utah, meaning conduct which was committed wholly or partly in the state of Utah—regardless of whether the conduct was formally charged.[34]

¶29 I would hold that Utah Code section 78B-6-111 is ambiguous, and would thus proceed under the doctrine of constitutional avoidance to conclude that section 111 must be read to apply only to in-state conduct.[35] If Utah Code section 78B-6-111 is read to apply to conduct that occurs outside of Utah, it poses a serious constitutional problem. The Due Process Clauses of the Fifth and Fourteenth Amendments "impose[] constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests."[36] Individuals have a right to fair notice[37] and an opportunity "to be heard before being condemned to suffer grievous loss of any kind."[38] Moreover, the more important the threatened interest, the more vigorous the procedural protection that is required under the law. The loss of one's children is one of the most "grievous" losses a person can suffer, and indeed, it is "plain be-

---

[33] UTAH CODE §§ 78B-6-111, 76-1-201. I believe this ambiguity stems from the phase "would constitute." As explained, I do not agree that the *expressio unius* canon has any relevance here.

[34] *See* UTAH CODE § 76-1-201(5)(c) (explaining that the "burden is upon the state to initially establish jurisdiction over [a criminal] offense . . . by showing . . . the offense was committed either wholly or partly within the borders of the state").

[35] To that extent, I agree with the majority in this case and *Nevares*, that a "serious due process question[] would arise" if Mr. Brooks's parental rights were to be forfeited by section 111. *Nevares*, 2015 UT 34, ¶ 41; *see supra* ¶ 16.

[36] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

[37] *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[38] *Mathews*, 424 U.S. at 333.

yond the need for multiple citation" that a parent's interest in his or her children is "far more precious than any property right."[39]

¶30 Because an unwed father's act of engaging in sexual conduct in his home state is almost certainly done without notice that he will be subject to the adoption laws of another state, I believe that section 111 poses a serious due process problem if it is applied to such out-of-state fathers, especially where section 111 simply cuts off the father's parental rights. Mr. Brooks, for example, committed criminal conduct under Pennsylvania law when he engaged in sexual intercourse with the child's mother; however, under Pennsylvania law it appears that he may still have been able to intervene in a subsequent adoption proceeding, despite the criminal circumstances of the conception.[40] Thus, under the law of Pennsylvania—the only state whose laws he had notice would be applied to him, Mr. Brooks's parental rights were not foreclosed at the threshold as they would be under section 111 in Utah. Recognizing the fundamental nature of the parental right, I would avoid such problems by adopting the second, equally

---

[39] *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotation marks omitted).

[40] *See* 23 PA. CONS. STAT. § 2711(a) (2014) (stating that "consent to an adoption shall be required of . . . [t]he parents or surviving parent of an adoptee who has not reached the age of 18 years"); *id.* § 2714 ("Consent of a parent to adoption shall not be required . . . if, after notice and hearing[,] . . . the court finds that grounds exist for involuntary termination . . . ."); *id.* § 2511(a)(7) (2014) (grounds for involuntary termination include when "the parent is the father of a child conceived as a result of a rape or incest"); 18 PA. CONS. STAT. § 3121(a) (2014) (defining rape as sexual intercourse "by forcible compulsion," "threat of forcible compulsion," or when the person is unconscious, substantially impaired, or mentally disabled); *id* § 3122.1(a) (2014) (defining "[s]tatutory sexual assault" and explaining that "*[e]xcept as provided in section 3121 (relating to rape)*, a person commits a felony of the second degree when that person engages in sexual intercourse with a complainant to whom the person is not married who is under the age of 16 years and that person is . . . four years older but less than eight years older than the complainant" (emphasis added)).

plausible interpretation of section 111 and holding that it applies only to conduct within Utah.

¶31 I disagree with the majority's interpretation of Utah Code section 78B-6-111. Because I believe the statute is ambiguous, I would analyze it under the doctrine of constitutional avoidance. Accordingly, I respectfully concur in the judgment only.

———————

Justice Durham, dissenting:

¶32 As I explained in my concurrence in *Nevares v. M.L.S.*, Utah Code section 78B-6-111 applies to all fathers whose paternal rights are based on a sex crime, regardless of whether they are subject to Utah's criminal jurisdiction. 2015 UT 34, ¶¶ 53–84, __ P.3d __ (Durham, J., concurring in the result). It therefore applies to Mr. Brooks.

¶33 However, unlike the conduct of the father in *Nevares*, Mr. Brooks's sexual contact with J.M.S.'s mother was a serious felony where it occurred. 18 Pa. Cons. Stat. § 3122.1 (2014) (making statutory sexual assault a second-degree felony when the perpetrator is between four and eleven years older than the victim). For this reason, he cannot appeal to the same constitutional doctrines that protected the father in *Nevares*. As the Seventh Circuit explained in *Peña v. Mattox*,

> [N]o court has gone so far as to hold that the mere fact of fatherhood, consequent upon a criminal act . . . [and] not cemented . . . by association with the child, creates an interest that the Constitution protects in the name of liberty. . . . The criminal does not acquire constitutional rights by his crime other than the procedural rights that the Constitution confers on criminal defendants.

84 F.3d 894, 900 (7th Cir. 1996). Thus, denying Mr. Brooks the right to contest J.M.S.'s adoption does not infringe any of his constitutionally protected liberties and, therefore, does not violate the Due Process Clause.

¶34 The majority disagrees, suggesting that it may violate the Due Process Clause for Utah's criminal law to punish Mr. Brooks

for the sexual assault he committed in Pennsylvania. *Supra* ¶ 16 & nn.3–5. This is correct and entirely sensible. Criminalizing Mr. Brooks's conduct, and punishing it, involved a host of difficult policy decisions: where to set the age limits on statutory rape, what penalty statutory rape should carry, whether people in Mr. Brooks's circumstances should be prosecuted, and what sort of plea deals they should be offered. Because Mr. Brooks's crime took place in Pennsylvania and affected—at the time—primarily citizens of Pennsylvania, these policy decisions rightfully belong to Pennsylvania.

¶35 But we are not deciding whether Mr. Brooks should be punished for the sexual assault he committed in Pennsylvania. Rather, we are deciding whether Mr. Brooks has a right to contest J.M.S.'s adoption, and this decision involves a very different set of policy questions. Should a father like Mr. Brooks be barred from contesting an adoption because of any sexual offense, or merely because of a violent one? Should an actual conviction be required to foreclose his rights, or is it sufficient for the adoption court to find, by clear and convincing evidence, that his paternal rights rest on criminal conduct? What if he is convicted of a misdemeanor on a plea bargain, as Mr. Brooks was here, but the undisputed facts clearly satisfy the elements of a serious felony?

¶36 The majority seems to suggest that, as a matter of constitutional law, all of these policy decisions must belong to Pennsylvania because that is where Mr. Brooks committed his crime. But in doing so, it ignores the weighty interests at stake for the state of Utah. Usually, a father like Mr. Brooks will be just one of four parties whose lives would be forever changed by an adoption: the father, the mother, the would-be adoptive parents, and the child. At the time of the adoption proceedings, at least two of these parties—the adoptive parents and the child—will usually be citizens of Utah, and frequently the child's mother will have become a Utah citizen as well. Further, the adoption proceedings will be taking place in a Utah court, and they will usually involve a Utah adoption agency that also has an interest in the outcome.

¶37 But according to the majority, despite the immense importance of this adoption to these Utahns, the state of Utah may be unable to make its own judgment as to whether Mr. Brooks's crime should disqualify him from intervening. Rather, it must simply accept the judgment of the Commonwealth of Pennsylva-

nia—no matter how repugnant that judgment might be to the people of Utah, and no matter that Pennsylvania has no more jurisdiction over the adoption of J.M.S. than Utah had over the prosecution of Jacob Brooks.

¶38 The legislature's manifest intent in section 111 was to protect people like J.M.S. and J.M.S.'s mother from fathers like Mr. Brooks. If Mr. Brooks had a constitutionally protected liberty at stake, the Due Process Clause would restrict the legislature's ability to carry out its intent—procedural due process would guarantee Mr. Brooks notice and a hearing, and substantive due process would limit the legislature's power to cut off his paternal rights. But Mr. Brooks has no such liberty at stake, so nothing prevents the legislature's will from being carried out. Mr. Brooks should be barred from intervening in this adoption.

———————